[S.F. No. 22732. In Bank. Nov. 6, 1970.]

GRIBALDO, JACOBS, JONES AND ASSOCIATES et al., Plaintiffs and Appellants, v.
AGRIPPINA VERSICHERUNGES A. G. et al., Defendants and Respondents.

**COUNSEL**

Spaeth, Blase & Farman, Spaeth, Blase, Valentine & Klein, Lawrence A. Klein and Guy Blase for Plaintiffs and Appellants.

Jones & Daniels and Robert E. Jones for Defendants and Respondents.

## OPINION

**BURKE, J.**—In this case, involving the interpretation of an errors and omissions indemnity insurance policy, a hearing was granted by this court after decision by the Court of Appeal, First Appellate District, for the purpose of giving further study to the problems presented. After such study we have concluded that the opinion of the Court of Appeal, prepared by Presiding Justice Molinari, correctly treats and disposes of the issues involved, and with certain further comments pertinent to contentions urged, it is adopted as and for the opinion of this court. Such opinion (with appropriate deletions and additions as indicated) is as follows:[1]

This is an appeal by plaintiffs from a declaratory judgment. Plaintiffs commenced this action seeking a judicial determination of their rights and duties under an errors and omissions indemnity insurance policy issued to plaintiff corporations by defendants. In essence, the declaration sought by plaintiffs was directed to the meaning of the deductible feature of the policy and its application to defense costs.

### Statement of the Case

Defendants, foreign organizations engaged in the business of writing insurance in California through duly qualified brokers, issued to plaintiffs an architects or engineers professional indemnity insurance policy covering the period from April 13, 1964 to April 13, 1967.

The policy "indemnifies the Assured [plaintiffs] against any claim or claims for breach of professional duty . . . which may be made against them during the period . . . by reason of any negligent act, error or omission, . . . ." The policy further provides that defendants "shall not be liable for any claim or claims unless the amount of claim exceeds the amount stated in the said Schedule as the deductible, . . . ." The deductible stated in the schedule is $2,500.

The policy does not directly impose a duty on defendants to defend actions against plaintiffs. The matters of defense and defense costs are mentioned only in the "conditions" to the policy as follows: ["1. The total liability of the Underwriters hereunder in respect of all claims made against the Assured in any one policy year . . . together with the costs and ex-

---

[1]Brackets together, in this manner [], are used to indicate deletions from the opinion of the Court of Appeal; brackets enclosing material (other than the editor's added parallel citations) are, unless otherwise indicated, used to denote insertions or additions by this court. (*Keizer* v. *Adams,* 2 Cal.3d 976, 978, fn. 1 [88 Cal.Rptr. 183, 471 P.2d 983].)

penses incurred in the defense of any claim shall not exceed the sum stated in the Schedule.] 2. The Assured shall not admit liability for or settle any claim or incur any costs or expenses in connection therewith without the written consent of the Underwriters, who shall be entitled at any time to take over and conduct in the name of the Assured the defense of any claim. Nevertheless, the Assured shall not be required to contest any legal proceedings unless the Lawyer (to be mutually agreed upon by the Assured and the Underwriters) shall advise that such proceedings should be contested. 3. The Underwriters shall not settle any claim without the consent of the Assured. If, however, the Assured shall refuse to consent to any settlement recommended by Underwriters and shall elect to contest or continue any legal proceedings in connection with such claim, then the Underwriters' liability for the claim shall not exceed the amount for which the claim could have been so settled, together with the costs and expenses incurred with their consent. . . ."

The dispute below centered around defendants' position that their liability [ ] [to indemnify plaintiffs and reimburse defense costs is limited to situations where the actual claim paid by plaintiffs totals] more than the deductible amount of $2,500. It was plaintiffs' position that defendants had an actual duty to defend and that defendants were required to pay defense costs whenever the initial demand against plaintiffs exceeded the deductible, no matter what the outcome of the demand.

### Findings of Fact and Conclusions of Law

Among other things the trial court found that the policy was neither ambiguous nor uncertain; that under the terms of the policy defendants were not required to defend plaintiffs against the claims or demands of third parties for alleged breach of professional duty within the purview of the policy; that defendants' obligation under the policy arises only if the liability of plaintiffs is fixed and is discharged in an amount exceeding the deductible $2,500; and that in accordance with the policy and Civil Code section 2778,[2] subdivision 3, defendants are obligated to reimburse plaintiffs for costs and attorney fees incurred and paid by plaintiffs in the defense of claims embraced within the provisions of the policy, that is, those claims in excess of $2,500 actually paid by plaintiffs.[3] [ ] Judgment was entered accordingly.

---

[2]Unless otherwise indicated, all statutory references hereinafter made are to the Civil Code.

[3]Other findings and conclusions of the court are discussed below where particularly pertinent to the contention under consideration.

## The Agreement of Indemnity

█ Before proceeding to discuss the interpretation of the subject insurance policy we observe that "An indemnity provision of a contract is to be construed under the same rules governing other contracts with a view of determining the actual intent of the parties." (*J. A. Payton* v. *Kuhn-Murphy, Inc.,* 253 Cal.App.2d 278, 281 [61 Cal.Rptr. 575]; *Buchalter* v. *Levin,* 252 Cal.App.2d 367, 375 [60 Cal.Rptr. 369].) █ In indemnity contracts, moreover, the provisions of section 2778[4] prescribing the rules for interpreting indemnity agreements, are as much a part of such instrument as those set out therein, unless a contrary intention appears. (*Thode* v. *McAmis,* 96 Cal.App.2d 833, 836-837 [216 P.2d 548]; *Weaver* v. *Grunbaum,* 31 Cal.App.2d 42, 49-50 [87 P.2d 406].)

█ Plaintiffs place strong reliance upon the case of *Gray* v. *Zurich Insurance Co.,* 65 Cal.2d 263 [54 Cal.Rptr. 104, 419 P.2d 168], and particularly on the principle they extract therefrom that "In interpreting an insurance policy we apply the general principle that doubts as to meaning must be resolved against the insurer and that any exception to the performance of the basic underlying obligation must be so stated as clearly to apprise the insured of its effect." (P. 269.) We take cognizance of this rule but also observe that it must be applied in conjunction with the rules applicable to the interpretation of contracts.[5]

## The Question of Ambiguity

Plaintiffs contend that the insurance policy is ambiguous and uncertain. Accordingly, they offered extrinsic evidence for the purpose of establishing that it was the intent of the parties that the policy afford plaintiffs the right to recover defense costs and expenses regardless of the amount paid by plaintiffs as the result of a claim of a third party. This

---

[4]Section 2778 reads in pertinent part: "In the interpretation of a contract of indemnity, the following rules are to be applied, unless a contrary intention appears: 1. Upon an indemnity against liability, expressly, or in other equivalent terms, the person indemnified is entitled to recover upon becoming liable; 2. Upon an indemnity against claims, or demands, or damages, or costs, expressly, or in other equivalent terms, the person indemnified is not entitled to recover without payment thereof; 3. An indemnity against claims, or demands, or liability, expressly, or in other equivalent terms, embraces the costs of defense against such claims, demands, or liability incurred in good faith, and in the exercise of a reasonable discretion; 4. The person indemnifying is bound, on request of the person indemnified, to defend actions or proceedings brought against the latter in respect to the matters embraced by the indemnity, but the person indemnified has the right to conduct such defenses, if he chooses to do so; . . ."

[5]With respect to *Gray* v. *Zurich Insurance Co., supra,* we note that the construction of the insurance policy was based upon its terms without the aid of extrinsic evidence.

evidence was admitted subject to defendants' motion to strike, which was timely interposed.[6] The trial court took the motion under submission and in its written memorandum of decision stated that it was unnecessary for the court to rule on the motion on the basis that there was nothing in the evidence offered by plaintiffs which showed an intent of the parties contrary to that expressed in the policy as interpreted pursuant to section 2778.

In *Delta Dynamics, Inc.* v. *Arioto,* 69 Cal.2d 525, 528 [72 Cal. Rptr. 785, 446 P.2d 785], the Supreme Court, relying on *Pacific Gas & Elec. Co.* v. *G. W. Thomas Drayage etc. Co., supra,* 69 Cal.2d 33, 39-40 [69 Cal.Rptr. 561, 442 P.2d 641], states the applicable principle thusly: " 'The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.' To determine whether offered evidence is relevant to prove such a meaning the court must consider all credible evidence offered to prove the intention of the parties. 'If the court decides, after considering this evidence, that the language of a contract, in the light of all the circumstances, is "fairly susceptible of either one of the two interpretations contended for . . ." [citations], extrinsic evidence to prove either of such meanings is admissible.' [Citation.]"

In applying the foregoing test, the preliminary consideration of all credible evidence offered to prove the intention of the parties requires that the trial court consider evidence which includes testimony as to the circumstances surrounding the making of the agreement including the object, nature and subject matter of the writing so that the court can place itself in the same situation in which the parties found themselves at the time of contracting. (*Pacific Gas & Elec. Co.* v. *G. W. Thomas Drayage etc. Co., supra,* at p. 40.)

Adverting to the extrinsic evidence offered by plaintiffs and preliminarily considered by the trial court in the instant case, we observe the following testimony. Donald Brown, plaintiffs' insurance broker, testified that he discussed with Ralph Jackson, a surplus line underwriter for Appleton & Cox of California, Inc., [ ] [the brokerage firm which procured the policy from defendants] how the deductible operated in relationship to the

---

[6]The procedure of admitting evidence conditionally by either reserving its ruling on the objection or by admitting the evidence subject to a motion to strike is proper where the trial court is not in a position to determine, whether in the light of all the offered evidence, the item objected to will turn out to be admissible. (See *Pacific Gas & Elec. Co.* v. *G. W. Thomas Drayage etc. Co.,* 69 Cal.2d 33, 40, fn. 7 [69 Cal.Rptr. 561, 442 P.2d 641]; and see Evid. Code, § 403.)

defense costs; that when he told Jackson, following the receipt of a policy form and prior to the issuance of the policy, that he could not "interpret" the exact action that would be taken if claims did occur, Jackson advised him that there would be a $2,500 deductible applicable to a claim under the policy and that legal fees would be taken care of under the policy without a deductible. Brown also testified that he later got a different interpretation from Jackson when he asked Jackson to contact the underwriters directly to get an interpretation from them and that he was advised by the underwriters that the interpretation made by plaintiffs was completely wrong. He testified that this communication was not received until early 1967 [after the policy had been issued].

Guy Blase, an attorney for plaintiffs, also testified that prior to the issuance of the policy he too had a conversation with Jackson concerning defense costs. He testified that Jackson told him that if a claim was in excess of the deductible then defense costs would be paid "from the ground up," that is, that in any case involving a claim in excess of $2,500 defense costs in their entirety would be paid by the insurer, but that if the claim was less than $2,500 defense costs would not be indemnified.

Avery Tindell, vice-president of Appleton & Cox in charge of surplus line operations, testified that on July 24, 1964, he sent a letter to Blase to the effect that [ ] [defendants were not liable for the defense of claims not "likely to exceed the $2,500 deductible." Ralph Jackson testified that he advised Blase that as far as the deductible was concerned the defense costs would be included "from the ground up" provided the claim exceeded the deductible, and that by the term "from the ground up" he (Jackson) meant from the first dollar, provided the claim exceeded $2,500. Jackson also testified that by the term "claim" he meant the claim made by the assured against the assurer, and not the claim made by a third party against the assured.

In addition to the foregoing extrinsic evidence, several letters and a cablegram were admitted into evidence. A letter dated April 3, 1964, from Jackson to the underwriters' representative in London, indicated an understanding that the deductible would not apply to defense costs and that if the plaintiffs used their own attorney in cases where the claim was under the deductible, the use of such attorney was in order but at the assured's cost. The same letter stated that if the claim was in excess of the deductible and plaintiffs had used their own attorney and his use was approved by the underwriters, the total legal cost would be borne by the underwriters. This letter requested a verification by cable of this understanding. The response to this letter with respect to the matter of defense was by a cablegram,

dated April 8, 1964, which, in pertinent part, read: ". . . please refer to policy Conditions One and Two." Another letter, dated April 8, 1964, from Jackson to Brown, with a copy to Blase, directed attention with respect to defense, to conditions 1, 2 and 3 of the insuring agreement and noted that these "will be found to be self-explanatory." [The foregoing correspondence was exchanged prior to the issuance of the policy. Subsequently,] another letter, dated July 22, 1964, from the claims manager of Appleton & Cox, confirmed the understanding had with Jackson on the question of fees. Blase responded to this letter on July 24, 1964, by a letter wherein he stated, "I feel it is clear that only in the event that a claim appears to exceed $2,500.00 will the Underwriter assume the cost of attorneys fees and your defense expenses of the insured."

As already pointed out the trial court did not formally rule upon defendants' motion to strike the offered extrinsic evidence but stated that it did not do so because that evidence did not show an intent of the parties contrary to that expressed in the policy as interpreted by section 2778.[7] [ ] In the light of this determination the trial court concluded that the pertinent provisions of the policy were not uncertain or ambiguous, and therefore concluded that these provisions were to be interpreted according to the intention expressed by the words of the policy as interpreted by section 2778. (See *Estate of Russell,* 69 Cal.2d 200, 211-212 [70 Cal.Rptr. 561, 444 P.2d 353].)

It is appropriate to observe here that neither of the parties contend it was error for the trial court not to admit the extrinsic evidence. Indeed, both of the parties assert that the basic insuring clauses and the subject conditions of the policy should be interpreted according to the provisions of section 2778. Accordingly, plaintiffs' claim of error is based on their contention that the trial court erroneously applied the rules of interpretation specified in section 2778. Our inquiry, therefore is whether the trial court's interpretation was erroneous. ■ In this regard we note that, since the interpretation does not turn on the credibility of extrinsic evidence, the interpretation is solely a judicial function and is, therefore, a question of law. Under these circumstances we are not bound by the trial court's interpretation. (See *Parsons* v. *Bristol Dev. Co.,* 62 Cal.2d 861, 865-866 [44 Cal.Rptr. 767, 401 P.2d 839]; *Estate of Platt,* 21 Cal.2d

---

[7]The trial judge, in his memorandum opinion, states as follows: "A fair interpretation of the correspondence of the parties relating to the negotiations for the insurance coverage and the testimony given at the trial confirms the understanding of the underwriters as expressed in the policy. It demonstrated that the underwriters did not agree to pay costs of defense unless they authorized and undertook the defense or unless the plaintiffs paid a claim in an amount exceeding $2500.00 previously consented to by them in writing."

343, 352 [131 P.2d 825]; *Estate of Russell, supra,* 69 Cal.2d 200, 213.) We, therefore, proceed to make an independent examination of the policy concurrently with the applicable provisions of section 2778.

### The "Claim"

As previously noted, the subject policy "indemnifies the Assured against any claim or claims for breach of professional duty. . . ." Plaintiffs contend that under the terms of the policy they are entitled to recover from defendants all costs and expenses incurred by them during the policy period in contesting *claims of third parties* where the *demand* of the third party exceeds $2,500. In this connection they assert that the word "claim" means *all* third party claims, whether or not actually paid.

■ In considering plaintiffs' contention we observe, initially, that the subject undertaking constitutes a contract of indemnity as against loss or damage, rather than indemnity against liability. (See *San Pedro Properties, Inc. v. Sayre & Toso, Inc.,* 203 Cal.App.2d 750, 755 [21 Cal.Rptr. 844]; where the policy of insurance contained similar language.) ■ As noted in *Ramey v. Hopkins,* 138 Cal.App. 685, 689 [33 P.2d 443], the distinction between an indemnity against liability and an indemnity against loss is that in the former the essence of the contract is that the event shall not happen while in the latter the indemnity is against the consequences of the event if it should happen. ■ Accordingly, the trial court properly invoked the rule of interpretation provided for in subdivision 2 of section 2778, applying to an indemnity against claims, rather than subdivision 1 of that section applying to an indemnity against liability.

Subdivision 2 of section 2778 provides that "Upon an indemnity against claims, or demands . . . or costs . . . the person indemnified is not entitled to recover without payment thereof." This rule of interpretation was properly utilized by the trial court in finding that "The obligation of Underwriters under the policy arises only if the liability of plaintiffs is fixed and plaintiffs discharge the liability by payment and only if such payment by plaintiffs exceeds the deductible amount of $2,500.00."[8]

---

[8]The "Memorandum Decision" which we are entitled to use for the purpose of discovering the process by which the trial judge arrived at his conclusions (*Union Sugar Co. v. Hollister Estate Co.,* 3 Cal.2d 740, 750 [47 P.2d 273]; *Henderson v. Fisher,* 236 Cal.App.2d 468, 472 [46 Cal.Rptr. 173]), indicates that the trial court specifically applied this rule. The trial court notes that ". . . a policy which indemnifies against any claim is not one which indemnifies against 'liability' but, rather, is one which imposes the obligation upon the indemnitor only if the indemnitee has paid a claim for which coverage is provided in the policy. Thus the liability occurs only when an actual loss has been sustained by the indemnitee."

Although it is true that the word "claim" connotes an assertion of a legal right and includes within its meaning a money demand (see *San Pedro Properties, Inc.* v. *Sayre & Toso, Inc., supra,* 203 Cal.App.2d 750, 755; *Tanner* v. *Best,* 40 Cal.App.2d 442, 445 [104 P.2d 1084]), an indemnitor is not liable for a claim made against the indemnitee until the indemnitee suffers actual loss by being compelled to pay the claim. (*San Pedro Properties, Inc.* v. *Sayre & Toso, Inc., supra,* at p. 756; *Ramey* v. *Hopkins, supra,* 138 Cal.App. 685, 686; see *Sunset-Sternau Food Co.* v. *Bonzi,* 60 Cal.2d 834, 843 [36 Cal.Rptr. 741, 389 P.2d 133].)

## Costs of Defense

The trial court properly determined that by applying subdivision 3 of section 2778 defendants were only obligated to reimburse plaintiffs for the costs, expenses and attorney fees in the defense of claims actually paid by plaintiffs in a sum in excess of the deductible amount of $2,500. Subdivision 3 of section 2778 provides that "*An indemnity against claims, or demands, or liability, . . . embraces the costs of defense against such claims, demands, or liability incurred in good faith, . . .*" (Italics added.) As properly analyzed by the trial judge in his "Memorandum Decision," subdivision 3 must be considered in connection with subdivision 2 with respect to what is meant by indemnification of a "claim." Accordingly, the costs and expenses referred to in subdivision 3 are those attendant to a claim which results in a loss within the purview of subdivision 2. (See *Buchalter* v. *Levin, supra,* 252 Cal.App.2d 367, 372-373.)

[It has been suggested that if plaintiffs may only recoup defense costs with respect to paid claims which exceed $2,500, they will have no incentive to defeat such claims, at least where their defense costs exceed the deductible amount. In other words, it would be to plaintiffs' advantage to lose and pay a claim in excess of $2,500, and to recover defense costs from defendants, rather than to defeat such a claim and thereby forfeit the right to reimbursement of those costs. However, "There is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement. [Citation.] This principle is applicable to policies of insurance. [Citation.]" (*Comunale* v. *Traders & General Ins. Co.,* 50 Cal.2d 654, 658 [328 P.2d 198].) Moreover, defendants have the right to take over and conduct the defense of any claim (Condition "2"), and are willing to "assume the risk" that plaintiffs will deliberately, or through apathy, fail to conduct an adequate defense.]

## The Duty to Defend

[ ] As already noted the subject policy does not set out any underlying obligation on the part of defendant to defend against the claims covered by the policy. In condition "2" defendants are given the right [ ] [to take over and conduct the defense of any claim, and plaintiffs are not required to contest any claim unless an attorney, selected by mutual agreement, so advises.] Plaintiffs urge that the duty to defend arises from an application of the rule of interpretation provided for in subdivision 4 of section 2778 which provides: "The person indemnifying is bound, on request of the person indemnified, to defend actions or proceedings brought against the latter in respect to the matters embraced by the indemnity, but the person indemnified has the right to conduct such defenses, if he chooses to do so; . . ."

The trial court interpreted the terms of the policy to mean that defendants were not obligated to defend plaintiffs against the claims or demands of third parties and that plaintiffs may be required by defendants to contest legal proceedings arising out of such demand or claim if a mutually agreed upon lawyer advises that such proceedings should be contested. [ ]

■ It is clear that under the provisions of subdivision 4 of section 2778 the indemnitor is required to defend matters embraced by the indemnity if the indemnitor is requested to do so by the indemnitee. However, it is apparent that with respect to the duty to defend the parties have indicated by the terms of the policy an intent contrary to that expressed in subdivision 4 insofar as defendants' duty to defend is concerned. Accordingly, the policy permits defendants to undertake a defense at their option [ ] [and requires plaintiffs to defend claims where so advised by counsel. These provisions make it apparent that defendants had no affirmative duty to defend plaintiffs, regardless of the size of any particular claim asserted against them. Accordingly, plaintiffs could have had no *reasonable* expectation that defendants had a duty to defend them. (See *Gray* v. *Zurich Insurance Co.,* *supra,* 65 Cal.2d 263, 269.)] The basis for this agreement is apparent because, as we have already indicated, the obligation of defendants to reimburse plaintiffs does not arise until plaintiffs have paid or discharged a claim in an amount in excess of the deductible. As pointed out by the trial court in its "Memorandum Decision" defendants "in each instance could stand by and assume the risk that the loss to the assureds might exceed the deductible amount, in which event they would become obligated not only to pay the assureds the excess loss but also all expenses and costs including attorney fees."

[ ] [Even if we assume, *arguendo,* that the policy failed to exclude the duty to defend arising under subdivision 4 of section 2778, the record

shows that plaintiffs voluntarily incurred defense costs without first obtaining defendants' consent thereto (as required by Condition "2" of the policy), and without first requesting defendants to furnish a defense (as required by section 2778, subdivision 4). ■ The provisions of Condition "2," requiring defendants' prior consent to the expenditure of defense costs and permitting defendants to assume the defense of any claim are common in liability insurance policies. Their purpose "is to prevent collusion as well as to invest the insurer with the complete control and direction of the defense or compromise of suits or claims. . . ." (44 Am.Jur.2d, Insurance, § 1524, p. 398; see 7a Appleman, Insurance Law and Practice, § 4681, pp. 422-423.)

[Similarly, the rationale underlying the statutory requirement of a prior request or demand to defend is evident: "An insurer's unwarranted *refusal* to defend a suit against the insured has been held to relieve the latter from his contract obligation to leave the management of such suits to the insurer, and to justify him in defending the action on his own account. [Fn. omitted.] And where the insured is thus *compelled* to conduct his own defense, it is uniformly held that he may recover the expenses of litigation, including costs and attorneys' fees, from the insurer. . . ." (Italics added; 7a Appleman, *supra*, § 4691, pp. 498-499; see *Arenson* v. *National Auto. & Cas. Ins. Co.,* 48 Cal.2d 528, 537 [310 P.2d 961].)

■ [In other words, it is only when the insured has requested and been denied a defense by the insurer that the insured may ignore the policy's provisions forbidding the incurring of defense costs without the insurer's prior consent, and under the compulsion of that refusal undertake his own defense at the insurer's expense. Thus, the sole question at issue is whether Underwriters refused a request to defend plaintiffs or consented to plaintiffs incurring defense costs at Underwriters' expense.

■ [The trial court expressly found that the plaintiffs made no request or demand that defendants undertake the defense of any claim, but that plaintiffs voluntarily undertook to defend all claims themselves. Nor is there any basis in the record for holding that defendants elected to employ plaintiffs' attorney to discharge their duty to defend. The fact is that defendants simply chose not to exercise their contractual *right,* under Condition "2," to control the defense themselves. There is no evidence whatsoever to support the theory that in doing so defendants also intended to discharge their statutory *duty* to defend plaintiffs. Simply put, defendants permitted plaintiffs to continue to use their own attorney, but at plaintiffs' own expense. In the absence of any demand by plaintiffs for a defense, defendants were clearly entitled to do so.

█ [Nor can it be said that defendants misled plaintiffs by failing to clarify the issue regarding defendants' obligation to reimburse plaintiffs for their own defense costs. When the question was raised, prior to the issuance of the policy, defendants' London broker referred plaintiffs' broker, Jackson, to Condition "2" of the policy which, as we have seen, unambiguously forbade plaintiffs from incurring any defense costs without defendants' prior consent. This reply was sufficient to disabuse plaintiffs of any notion that defendants would assume responsibility for the payment of plaintiffs' defense costs. Nevertheless, plaintiffs voluntarily incurred these costs without first demanding a defense from defendants.

█ [Had plaintiffs made the statutory demand, defendants would have been required to choose between accepting the defense at their expense, consenting to the expenditure of defense costs by plaintiffs' attorney, or refusing to defend (in which case plaintiffs could have assumed the defense at defendants' expense). Having failed to make such a demand and thereby put defendants to a choice, plaintiffs should not be entitled to recover defense costs voluntarily incurred by them.

### Other Claims

█ [Plaintiffs asked the trial court to determine if defendants were required to reimburse them for two claims of third parties made against plaintiffs. One of these involves the alleged negligence of a company known as Hersey Testing & Control, Inc. This company performed work for William DeJaeger and his wife in 1960. The company was dissolved in 1962 and its assets were distributed to its shareholders, who used the assets to form plaintiff Gribaldo, Jacobs, Jones and Associates. The shareholders of the two companies were identical. After plaintiff Gribaldo purchased the policy involved here the DeJaegers brought suit against Hersey and Gribaldo, alleging that the work had been negligently performed. Gribaldo was apparently joined in the action on the theory that it was Hersey's successor in interest and its *alter ego.* Gribaldo moved to dismiss on the ground that it was not in existence when the alleged negligence occurred, but the trial court denied the motion. Gribaldo thereupon participated in the settlement and it sought from the trial court in the present case a declaration that defendants were liable under the policy to reimburse it for the amount it was compelled to pay to the DeJaegers.

[The policy indemnifies plaintiffs against any claim for breach of professional duties which may be brought against "them . . . or any person who has been, is now, or may hereafter during the subsistence of the Insurance be

employed" by them or "any Architect or Engineer . . . retained or employed" by them. The trial court found that the claim made against Gribaldo for the negligence of Hersey is not covered by the policy since, by its terms, it applies only to culpable conduct committed by Gribaldo and its employees.

[Gribaldo argues that defendants are liable because the trial court's ruling in the DeJaeger action establishes that Hersey and Gribaldo are identical. We do not know the basis upon which the trial court in the DeJaeger action denied the motion to dismiss Gribaldo. Although it has been held that a person need not be described by name in order to be an insured under the policy, his identity as an insured must be ascertainable by applying the description contained in the policy. (4 Appleman, Insurance Law and Practice, § 2341, p. 328.) Here the description of the insured does not cover a predecessor to Gribaldo. Thus plaintiffs cannot prevail as to this item.

[Another claim which plaintiffs contend defendants must pay involves the Palo Alto Unified School District.[9] Plaintiff Testing & Controls, Inc. performed certain work for the district but determined to forego its fee in order to avoid a potential claim by the district against Testing & Controls. The trial court found that Testing & Controls had failed to obtain defendants' consent for the forgiveness of the debt and that if consent had been obtained defendants would have been liable under the policy for these fees. Admittedly, Testing & Controls did not request defendants' consent to forego payment. However, it is asserted that defendants in effect gave their consent because they were kept informed of the situation involving the district and knew of Testing & Controls' decision to forego payment. The trial court's finding that it failed to obtain defendants' consent to the settlement, as required by the policy, is supported by the evidence. Thus plaintiffs' claim on this item was also properly denied.]

### Conclusion

In view of our independent examination of the terms of the policy in question we conclude that these terms were properly interpreted by the trial court. Accordingly, the trial court properly applied the applicable principles of interpretation to the various and several claims against plaintiffs which were submitted to the trial court for its determination as to whether defend-

---

[9]Defendants aver that the forgiveness of a fee cannot properly be called a "claim" under the policy. The term is used here for purposes of literary convenience.

ants were obligated to pay said claims and the costs of defense of said claims.

The judgment is affirmed.

Wright, C. J., McComb, J., and Sullivan, J., concurred.

**MOSK, J.**—I dissent.

Plaintiffs are soil engineers and are also engaged in testing construction materials. Underwriters are three foreign insurers who issued a policy to plaintiffs, effective April 13, 1964, insuring them against "any claim or claims for breach of professional duty which may be made" against them "arising from any negligent act, error or omission" committed by them or their employees for which they would be legally liable. It was provided that Underwriters would not be liable for any claim unless the amount exceeded the $2,500 deductible. The policy was procured through the offices of a surplus line broker, Appleton & Cox of California.

The only references in the policy relating to the defense of actions are contained in three paragraphs under the heading "Conditions." They provide as follows:

"1. The total liability of the Underwriters hereunder in respect of all claims made against the Assured in any one policy year . . . together with the costs and expenses incurred in the defence of any claim shall not exceed the sum stated in the Schedule.

"2. The Assured shall not admit liability for or settle any claim or incur any costs or expenses in connection therewith without the written consent of the Underwriters, who shall be entitled at any time to take over and conduct in the name of the Assured the defence of any claim.

"Nevertheless, the Assured shall not be required to contest any legal proceedings unless a Lawyer (to be mutually agreed upon by the Assured and the Underwriters) shall advise that such proceedings should be contested.

"3. The Underwriters shall not settle any claim without the consent of the Assured. If, however, the Assured shall refuse to consent to any settlement recommended by Underwriters and shall elect to contest or continue any legal proceedings in connection with such claim, then the Underwriters' liability for the claim shall not exceed the amount for which the claim could have been so settled, together with the costs and expenses incurred with their consent up to the date of such refusal, provided always that Under-

writers' total liability under this Insurance shall not exceed the sum specified in the Schedule."

A substantial number of actions was filed against plaintiffs alleging breach of their professional duties and asserting damages in excess of $2,500. The dispute as to Underwriters' liability for defending these actions arose shortly after the policy was issued. Plaintiffs, with the express consent of Underwriters, utilized their own attorney to defend the suits. They filed this action in declaratory relief and prayed for judgment in the amount of their defense costs. Plaintiffs prevailed in some of the actions filed against them, and lost in some, and others were still pending at the time of this trial.

In order to comprehend the problem involved we must discriminate between Underwriters' duty to defend a third party action filed against plaintiffs and the duty to reimburse plaintiffs for their defense costs. As to the latter, the trial court found that the reference in subdivision 3 of Civil Code section 2778 to an insurer's duty to pay "the costs of defense against . . . claims" applied only to those defense costs which plaintiffs had paid in satisfying judgments (or settlements) which exceeded $2,500. Thus, it concluded that if plaintiffs prevailed in a suit brought against them by a third party or if they were ultimately required to pay less than $2,500 Underwriters was not compelled to reimburse them for defense costs even if the prayer of the complaint sought more than $2,500.

Subdivision 4 of Civil Code section 2778 relates to the duty to *defend* actions on request of the insured "in respect to the matters embraced by the indemnity." The trial court determined that Underwriters had no obligation to defend under this subdivision and that plaintiffs made no request of Underwriters to undertake a defense of the claims but voluntarily undertook the defense. In its opinion the court stated that the duty to defend under subdivision 4 would arise only if the obligation to reimburse for a claim paid exceeded the deductible. The Underwriters could stand by, stated the court, and assume the risk that the loss to plaintiffs might exceed the deductible amount, in which event Underwriters would become liable for the excess loss and the costs of defense.

I turn to the applicability of subdivision 4 of Civil Code section 2778 to the policy involved here. At the threshold there is the problem as to whether the subdivision is to be employed in interpreting the policy since, by the terms of the section, it is to be applied only in the event a contrary intention does not appear in the policy itself. Any doubt as to whether there is an obligation to defend must be resolved in the insured's favor (*Fireman's Fund Ins. Co.* v. *Chasson* (1962) 207 Cal.App.2d 801, 805 [24 Cal.Rptr. 726]),

all ambiguities in a policy must be resolved against the insurer, and any exceptions to the performance of the basic underlying obligation in the policy must be so stated as to clearly apprise the insured of its effect (*Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 269 [54 Cal.Rptr. 104, 419 P.2d 168]). In order to avoid importing the duty to defend imposed by subdivision 4 into the policy we must therefore find clear, unambiguous language in the policy stating that Underwriters has no duty to defend claims made against plaintiffs by third parties.

I find no such language here, and the majority point to none. The policy does not in express terms provide either that Underwriters need not defend third party actions brought against plaintiffs or that plaintiffs are required to defend such actions.

Paragraph 1 under "Conditions" in the policy, quoted above, provides merely that Underwriters' total liability, together with defense costs, should not exceed a stated sum.

Paragraph 2 provides that plaintiffs shall not admit liability for or settle any claim or incur costs or expenses in connection therewith without the written consent of Underwriters, who shall be entitled at any time to take over and conduct the defense in the name of plaintiffs.

This provision gives Underwriters the power to refuse to consent to a settlement or an admission of liability by plaintiffs and, if plaintiffs attempt to pursue such a course, i.e., if they do not wish to oppose the claim, Underwriters may take over and conduct the defense in plaintiffs' name. For example, if plaintiffs believe that it would damage their business reputation to proceed to trial on a complaint filed by a third party, they might wish to admit liability or settle but they are prohibited from doing so without Underwriters' consent. Contrary to Underwriters' contention, the fact that the provision states that it has the *right* to take over the defense in this situation is not inconsistent with its duty to conduct the defense where no desire of plaintiffs for settlement or admission of liability is in issue.

The next sentence of paragraph 2 states that *nevertheless* plaintiffs "shall not be required to contest any legal proceedings unless a Lawyer (to be mutually agreed upon by the Assured and the Underwriters) shall advise that such proceedings should be contested."

The trial court found that this provision required plaintiffs to defend claims when the lawyer so advised. While the provision conceivably can be interpreted in this manner, it is not the only rational construction of the language.

Plaintiffs maintain that this sentence refers to a decision-making mechanism to be used in the event they wish to settle a claim and Underwriters contrarily insists they should "be required to contest" the claim. That is, should such a dispute arise between plaintiffs and Underwriters, the provision states that it is to be resolved by a lawyer mutually agreed upon between the parties. This construction of the sentence is plausible for several reasons. It provides some measure of protection to plaintiffs by the intervention of a neutral party whenever it would be to their interests to settle or admit liability. Moreover, the sentence is preceded by the word "nevertheless," which indicates that it is concerned with another aspect of the matter set forth in the prior sentence, i.e., admitting liability or settling claims. It must also be noted that paragraph 1 and the first sentence of paragraph 2 refer to the "defence" of claims where Underwriters intended this meaning. There is no reason to suppose that the same word would not have been employed in the second sentence of paragraph 2 (instead of the word "contest") if this is what Underwriters had intended.

The third paragraph refers to a situation the reverse of that covered by the second, i.e., a circumstance in which Underwriters desires to settle a claim but plaintiffs do not. It prohibits Underwriters from settling any claim without the consent of plaintiffs but provides that if plaintiffs refuse to consent to any settlement and elect to contest or continue any legal proceedings, then Underwriters' liability should be limited to the amount for which the claim could have been settled, together with costs up to the date of plaintiffs' refusal.

I do not intend to imply that no other meaning of these provisions is possible. Certainly contrary interpretations may be urged with rationality. Where the majority opinion falters, however, is in failing to recognize that nowhere is Underwriters' duty to defend, imposed by statute, negated by clear, unambiguous language in the policy.

The trial court indicated in its memorandum opinion that subdivision 4 of the statute applies only if the obligation to reimburse for a claim *paid* exceeded the deductible sum. That is, that Underwriters would discharge its obligation under the subdivision by paying plaintiffs their defense costs if a judgment or settlement against plaintiffs exceeded that amount and was paid by them. This conclusion is incorrect. Subdivision 4 imposes upon Underwriters a duty to *defend* an action brought against plaintiffs in respect to matters embraced by the indemnity. The provision must mean at the very least that whenever a third party brings an action against plaintiffs within

the policy coverage and the prayer is for more than $2,500, Underwriters must provide a defense against the third party's demand.[1]

The duty to defend, as opposed to the duty to reimburse for the costs of defense, can arise only prior to the final determination of the action. As was said in *Gray* v. *Zurich Insurance Co., supra*, 65 Cal.2d 263, 271-272, "[T]he nature of the obligation to defend is itself necessarily uncertain. Although insurers have often insisted that the duty arises only if the insurer is bound to indemnify the insured, this very contention creates a dilemma. No one can determine whether the third party suit does or does not fall within the indemnification coverage of the policy until that suit is resolved. . . . The carrier's obligation to indemnify inevitably will not be defined until the adjudication of the very action which it should have defended." (Fn. omitted.) Both *Gray* and *Fireman's Fund Ins. Co.* v. *Chasson, supra*, 207 Cal.App.2d 801, 804-805, make it clear that the obligation to defend is broader than the duty to indemnify and that the duty to defend exists if the complaint shows a *potential* liability within the policy coverage.

It seems evident that the defense requirement set forth in subdivision 4 necessarily must be discharged prior to final judgment. Thus, the statement in the subdivision that the duty to defend exists "in respect to the matters embraced by the indemnity" must be interpreted to mean at least that the duty arises whenever a complaint alleges a cause of action for damages the indemnitor would be compelled to pay if the third party prevails in the suit against the indemnitee.[2]

---

[1] I do not mean to imply that the duty to defend is limited to a situation in which the complaint alleges a cause of action relating to a risk within the policy. In *Gray* v. *Zurich Insurance Co., supra*, 65 Cal.2d 263, we held that even where the complaint alleged a risk outside the carrier's liability to indemnify the insured, the carrier would be compelled to defend the action if *potential* liability was created by the suit. Thus, the insurer was required, in determining potential liability, to take cognizance of facts outside the complaint which would raise the possibility that it would be liable under the policy. Here we have a stronger case than *Gray*—i.e., the complaint alleges coverage within the policy but the carrier nevertheless argues that it has no duty to defend.

[2] In connection with the holding in *Gray* that there may exist a duty to defend even if the complaint alleges a risk outside the policy coverage, we stated that the third party should not be permitted to act as the arbiter of the policy's coverage by confining the insurer's duty to defend to the face of the complaint. (65 Cal.2d at p. 276.) Underwriters, relying upon this statement, contends that if we require an insurer to defend whenever the complaint shows on its face a liability within the policy coverage, we would be rendering the third party complainant the arbiter of the insured's rights under the policy, contrary to the statement in *Gray*. If we were to accept this argument the duty to defend imposed upon an insurer would be rendered virtually meaningless. Clearly, *Gray* held that the insurer must defend in all cases in which the complaint upon its face alleges a risk within the policy but it extended the duty even further in a situation involving knowledge by the insurer of a potential risk from information dehors the policy.

Underwriters attempts to distinguish *Gray,* pointing out that there the requirement of a defense was contained within the four corners of the policy whereas no such provision exists in the policy involved here. It seems obvious without elaboration that there is no substantive difference between defense duties specified by policy provision and those imposed by statute. (See *Interinsurance Exchange* v. *Ohio Cas. Ins. Co.* (1962) 58 Cal.2d 142, 148 [23 Cal.Rptr. 592, 373 P.2d 640].)

Subdivision 4 also provides that the insurer must defend an action or proceeding on request of the insured. The trial court found that plaintiffs did not request that Underwriters undertake the defense of these actions and that plaintiffs voluntarily undertook this burden. However, Underwriters was notified of every action brought by third parties against plaintiffs and appropriate claim forms were filed with Underwriters.

An insurance adjuster employed by Underwriters testified that he acted on its behalf in attempting to work out problems with plaintiffs in connection with providing a defense against third party claims. He stated further that there had been a dispute on this subject from the inception and that he was aware of plaintiffs' interpretation of the policy. In order to avoid a multiplicity of lawsuits whenever a third party filed an action against plaintiffs in excess of $2,500, as Underwriters' agent he recommended that plaintiffs' attorney be employed to defend the actions.

This evidence shows that Underwriters, with notice of third party claims in excess of $2,500, and with knowledge of plaintiffs' interpretation of the policy provisions, employed plaintiffs' own attorney to defend the actions. Moreover, as we shall see, Underwriters knew, even before the issuance of the policy, that plaintiffs' attorney would be employed at Underwriters' expense to defend actions in which a third party sought more than $2,500 in damages. Since Underwriters chose to discharge its duty to defend by employing plaintiffs' attorney for this purpose it must be held to have waived the statutory, and in this circumstance the meaningless, requirement that plaintiffs make a demand for a defense.

My interpretation of the defense duties of Underwriters is indicated not only by the legal construction discussed above but also by pragmatic aspects of the parties' relationship. If the policy were to be construed as requiring plaintiffs to defend all actions filed against them by third parties they would have little incentive to seek a defense verdict in many cases. In all superior court actions which were brought by third parties the prayer is for more than $2,500 and in many instances plaintiffs' eventual liability is less than that sum. Attorney's fees and costs exceed $2,500 in a substantial number

of the actions filed by these third parties. If plaintiffs lose these cases their liability will be limited to $2,500 but if they win they could be liable for attorney's fees far exceeding that amount.

Even if Underwriters exercises its right under the policy to assume the defense of a claim it might be psychologically difficult for plaintiffs to cooperate fully when a verdict for them would cost them more than an adverse judgment. In one case costs of defense have already mounted to $9,500. Underwriters has assumed the defense, and plaintiffs' liability if the suit is won will be several times over its liability if it is lost.

Underwriters concedes the foregoing possibilities, but insists it will assume the risk. It suggests the danger is obviated by the policy provision that the insurance is void if plaintiffs prefer any claim knowing it to be false or fraudulent. Moreover, it asserts the risk of noncooperation exists theoretically in every policy since whenever a party is fully insured he has no pecuniary interest in defending the suit but the problem rarely arises because an insured is generally sufficiently interested in the outcome of the suit to cooperate with the insurer.

While the foregoing contention may have merit, the undeniable fact is that if the policy is interpreted as Underwriters maintains it should be, plaintiffs would advance their pecuniary interest in many cases by failing to cooperate if Underwriters conducts the defense and by losing the suit if plaintiffs themselves were defending. We do not suggest that a policy may not provide for such consequences, but these practicalities have a bearing upon the reasonable interpretation to be given the terms of the contract. A policy should not be interpreted to compel a party to "indulge in financial masochism." (See *Critz* v. *Farmers Ins. Group* (1964) 230 Cal.App.2d 788, 801 [41 Cal.Rptr. 401, 12 A.L.R.3d 1142].)

The trial court's interpretation of the policy was incorrect for other reasons than those set forth above. The court concluded that the policy was not ambiguous, but nevertheless during the trial it admitted evidence regarding the negotiations which led up to the purchase of the policy by plaintiffs, subject to a motion to strike. This evidence consisted largely of conversations between plaintiffs' attorney and Ralph Jackson, an employee of Appleton, the broker through which the policy was purchased. There was also documentary evidence of communications between plaintiffs' attorney and Appleton as well as between Appleton and a London broker who placed the insurance with Underwriters. Underwriters moved to strike this evidence on the grounds that it violated the parol evidence rule, that it was immaterial, and that no proper foundation was laid because Appleton was

not an agent of Underwriters and representations by Appleton's employees could not bind Underwriters.

The trial court found that the policy was not ambiguous and that Appleton was not the agent of Underwriters. However, it did not rule on the motion to strike because, according to its memorandum opinion, it found that nothing in the evidence offered by plaintiffs showed an intent of the parties contrary to that expressed in the policy as interpreted by the court.

I assume for the purpose of discussing this aspect of the case that the trial court was correct in concluding that Jackson was not an agent of Underwriters and I shall not consider the testimony regarding his representations to plaintiffs' attorney. However, the court was not correct in its determination that the policy was unambiguous, as is evident from my prior discussion. In any event, it was required to admit the extrinsic evidence under the rule set forth in the majority opinion in *Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33 [69 Cal.Rptr. 561, 442 P.2d 641], decided after judgment was rendered by the trial court.

If we confine our consideration of the extrinsic evidence to communications between Appleton and Underwriters, the conclusion is compelled that Underwriters knew that plaintiffs' understanding of the policy prior to its purchase was that Underwriters would pay all legal costs if a third party's claim exceeded $2,500. Plaintiffs' attorney was concerned about who would bear the cost of defending actions under the policy and he contacted Jackson, who made certain representations to him on the subject. Jackson in turn dealt through a London broker who arranged Underwriters' acceptance of the risk and who was the only person involved in the negotiations with the ability to make direct contact with Underwriters. Prior to the purchase of the policy, Jackson wrote the London broker as follows: "A question arose . . . on the subject of defense costs, and we have indicated that the deductible would not apply to such costs. . . . The point also arose regarding the use by the assured of their own attorney. We have indicated that in cases where the claim was under the deductible that, subject to underwriters being put on notice, the use of such attorneys (who are apparently well versed in this type of business) would be in order, but at the assured's cost. If, however, the claim was in excess of the deductible, then underwriters would probably approve the continued use of such attorneys subject to the supervision by an attorney of their own chosing [*sic*], the total legal cost to be borne by underwriters. We shall be obliged if you will . . . verify our understanding regarding defense."[3]

---

[3]It should be noted that Jackson used the phrase ". . . subject to Underwriters being put on notice . . ." and not the statutory term in subdivision 4, ". . . on

The reply from the London broker was a cablegram stating, "Please refer to policy conditions one and two." Jackson thereafter wrote agents of plaintiffs, "You will recollect that the main question to be resolved is that pertaining to defense, and your attention is drawn to conditions 1, 2 and 3 of the insuring agreement, which will be found to be self-explanatory."

Jackson testified that when he used the term "claim" in the letter quoted he meant the claim by plaintiffs against Underwriters after plaintiffs had satisfied a judgment in an action brought by a third party and not a claim in an action brought by a third party against plaintiffs. However, the letter is not reasonably susceptible of such construction. There would be no need for the continued use of an attorney subject to the supervision of another attorney to collect from Underwriters a sum which plaintiffs had already paid out pursuant to a judgment or a settlement.

Thus, Underwriters knew that plaintiffs had some question regarding defense costs prior to the issuance of the policy and knew that Appleton had represented to plaintiffs that they could use their own attorneys to defend third party claims at Underwriters' cost in the event the prayer was over $2,500. Yet, when asked for a verification of this understanding it merely referred plaintiffs to provisions of the policy which did not clarify the issue. Underwriters must, of course, be charged with knowledge of its statutory duty to defend absent a clear policy provision to the contrary. It is elementary that if Underwriters knew that in purchasing the policy plaintiffs understood a defense would be provided for third party claims over $2,500, in the absence of an unequivocal correction of that understanding plaintiffs' interpretation of the policy must prevail. (See 3 Corbin on Contracts (1960) § 537, p. 45.)

I am convinced that under the circumstances of this case plaintiffs should have been awarded damages. However, I have no disagreement with the majority on the disposition of the two claims involving Hersey Testing & Control, Inc.

I would return the matter to the trial court for the purpose of computing damages sustained by plaintiffs in accordance with the views expressed in

---

request of the person indemnified . . . ." The evidence is uncontradicted, as discussed above, that Underwriters was notified of every action brought by third parties.

this opinion, since it may be that some of the third party claims which were pending at the time of the judgment have now been finally resolved.

The judgment should be reversed.

Peters, J., and Tobriner, J., concurred.