KENNARD, J.—
I dissent.
The majority holds that standard language in a comprehensive general liability (CGL) insurance policy, under which the liability carrier promises to indemnify the insured for “all sums that the insured becomes legally obligated to pay as damages,” does not obligate the carrier to pay the costs of complying with an administrative order to mitigate and remediate the effects of environmental pollution. I would hold that it does.
The issue presented here is logically related to two earlier decisions of this court that also dealt with the subject of insurance coverage under CGL policies in the context of enforcement proceedings under state and federal environmental protection laws. In AIU Ins. Co. v. Superior Court (1990) 51 Cal.3d 807 [274 Cal.Rptr. 820, 799 P.2d 1253] (AIU), this court held that when the government recovers or imposes environmental pollution remediation costs in a civil suit, those costs are, in the words of the standard CGL policy, sums that the insured is “legally obligated to pay as damages.” (Id. at pp. 837, 841.) I joined in that decision, which was unanimous. In Foster-Gardner, Inc. v. National Union Fire Ins. Co. (1998) 18 Cal.4th 857 [77 Cal.Rptr.2d 107, 959 P.2d 265] (Foster-Gardner), a bare majority of this court held that an administrative agency notice identifying the recipient as a party potentially responsible for environmental pollution, and directing the recipient to assume responsibility for remediation of the pollution, does not trigger the duty of defense under a standard CGL policy issued to the recipient. (Id. at pp. 881-882.) In a dissenting opinion joined by Justices Mosk and Werdegar, I disagreed with that holding. (Id. at p. 888 (dis. opn. of Kennard, J.).)
Had this court adopted the reasoning and conclusion of the dissent in Foster-Gardner, supra, 18 Cal.4th 857, 888, there would be little room for argument about the proper resolution of the issue presented here. In other *976 jurisdictions where coercive administrative proceedings under state or federal environmental laws have been held to trigger a carrier’s defense obligation under a standard CGL policy, invariably the courts have held also that administrative cleanup orders trigger a CGL carrier’s duty to indemnify. (See, e.g., Coakley v. Maine Bonding and Cas. Co. (1992) 136 N.H. 402 [618 A.2d 777]; Spangler Const. v. Indus. Crankshaft (1990) 326 N.C. 133 [388 S.E.2d 557].)
But the converse is not equally true. One may accept the majority decision in Foster-Gardner as binding precedent and yet conclude that a CGL insurance carrier has a duty to indemnify its insured for the costs of complying with an administrative cleanup order. Indeed, the rules of insurance policy construction articulated in Foster-Gardner and in AIU strongly favor this conclusion. (See Foster-Gardner, supra, 18 Cal.4th at pp. 868-869; AIU, supra, 51 Cal.3d at pp. 821-822.)
Because an insurance policy is a contract, the mutual intention of the parties at the time the contract was formed controls the meaning of its terms. (Foster-Gardner, supra, 18 Cal.4th at p. 868; AIU, supra, 51 Cal.3d at pp. 821-822.) “Such intent is to be inferred, if possible, solely from the written provisions of the contract. ([Civ. Code], § 1639.) The ‘clear and explicit’ meaning of these provisions, interpreted in their ‘ordinary and popular sense,’ unless ‘used by the parties in a technical sense or a special meaning is given to them by usage’ (id., § 1644), controls judicial interpretation. (Id., § 1638.) Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning. [Citations.] [¶] If there is ambiguity, however, it is resolved by interpreting the ambiguous provisions in the sense the promisor (i.e., the insurer) believed the promisee understood them at the time of formation. (Civ. Code, § 1649.)” (AIU, supra, at p. 822; see also Foster-Gardner, supra, at p. 868.)
Here, the policy language to be construed under these rules obligates the carrier to indemnify the insured for “all sums that the insured becomes legally obligated to pay as damages.” The majority does not dispute that an insured is “legally obligated” to comply with an administrative cleanup order to remediate environmental pollution. (See maj. opn., ante, at p. 963.) But the majority insists that money paid in compliance with an administrative cleanup order is not “damages” because “damages” are only “money ordered by a court.” (Maj. opn., ante, at p. 964.) In defense of this notion that only a court may award damages, the majority relies heavily on Foster-Gardner, supra, 18 Cal.4th 857, in which this court concluded that the term “suit” in the CGL policy provision defining the duty to defend refers only to a judicial proceeding.
*977 The principal flaw in this analysis is that the term “suit” nowhere appears in the CGL policy’s indemnity provision. The majority dismisses this objection by postulating that “[t]he provision imposing the duty to indemnify impliedly links ‘damages’ to a ‘suit,’ i.e., a civil action prosecuted in a court.” (Maj. opn., ante, at p. 962, italics added.) This implied link between the defense and indemnity provisions, insofar as it imposes a judicial proceeding limitation, is a legal fiction that the majority conjures from the void to fill the yawning gap in its analysis.
To justify its linkage of the term “suit” in the defense provision and the term “damages” in the indemnity provision, the majority states that “it is in a ‘suit’ that ‘damages’ are fixed in their amount through the court’s order.” (Maj. opn., ante, at p. 962, fn. omitted.) But to say that a court may award “damages” in a civil “suit” in no way excludes the possibility that an administrative agency may also award “damages” by administrative order, just as the power of a court to issue a subpoena or hear testimony does not logically exclude administrative agencies from doing likewise. This court has frequently acknowledged that administrative agencies may award damages, provided they act with statutory authority and without violating the state Constitution’s judicial powers clause. (See, e.g., Walnut Creek Manor v. Fair Employment & Housing Com. (1991) 54 Cal.3d 245, 255-256 [284 Cal.Rptr. 718, 814 P.2d 704].)
In AIU, this court construed the term “damages” as used in standard CGL indemnity provisions in a way that reveals the flaws in the majority’s conclusion here that the term is inherently limited to judicial proceedings. There, this court summarized the basic concepts underlying various statutory and dictionary definitions of “damages”: “Each [definition] requires there to be ‘compensation,’ in ‘money,’ ‘recovered’ by a party for ‘loss’ or ‘detriment’ it has suffered through the acts of another.” (AIU, supra, 51 Cal.3d 807, 826, fns. omitted.) Notably absent from this summary is the notion that damages are recoverable only through a judicial rather than an administrative proceeding. In AIU, this court concluded that “damages” included not only money recovered by an administrative agency as reimbursement for cleanup costs that the agency had paid, but also the costs of complying with remedial cleanup injunctions. (Id. at pp. 837, 841-842.) This court rejected a narrow construction of damages that “would make insurance coverage hinge on the ‘mere fortuity’ of the way in which government agencies seek to enforce cleanup requirements, would unreasonably constrain the agencies’ choice of cleanup mechanisms, and would introduce substantial inefficiency into the cleanup process.” (Id. at pp. 840-841.) And this court stressed that “an insured would reasonably expect equal coverage of the costs of equivalent or alternative remedies.” (Id. at pp. 841-842.) Administrative cleanup *978 orders and court injunctions are equivalent or alternative remedies for imposing pollution remediation costs, and an insured would reasonably expect equal coverage for both. The majority’s limitation of “damages” to money ordered by a court makes coverage turn on the fortuity of the government agency’s choice of enforcement mechanism; it is just the sort of rigid and formalistic definition this court rejected in AIU. Under the logic of AIU, therefore, the costs of complying with an administrative order are within the indemnity coverage of the standard CGL policy.
Further support for the conclusion that the parties to the CGL insurance agreement intended “damages” to include costs of complying with administrative cleanup orders is found in the circumstances of the issuance of the policies in this case, as Justice Aldrich explained in his dissenting opinion in the Court of Appeal. After noting that neither “suit” nor “judgment” appears in the indemnity provision of the policy at issue, which provided primary coverage, Justice Aldrich reasoned that the omission was persuasive evidence that the insurers, in drafting this policy, did not intend to indemnify only those damages awarded in a civil action or by a final judgment. Had they intended such limitations, the insurers could easily have agreed to pay on behalf of the insured, for example, “all sums that the insured becomes legally obligated by final judgment to pay as damages.” The insurers did not do so in the primary policy.
Although language of this sort does not appear in the indemnity provision of the primary policy, it does appear in another CGL policy written and issued on the same day by the same carrier to the same insured. In this other policy, which provided excess coverage, the carrier promised to pay “all sums which the insured shall by law become liable to pay and shall pay or by final judgment be adjudged to pay ... as damages. . . .” (Italics added.) The italicized language in the excess policy shows that the insurer understood how to restrict the indemnity obligation to sums that the insured was required to pay as damages by final judgment (that is, sums ordered by a court in a civil action) when that was its intent. This limitation should not be read into a policy from which the insurer appears to have deliberately omitted it.
Moreover, as Justice Aldrich also pointed out, reliance on an “implied link” between provisions using markedly different language is inconsistent with Foster-Gardner’s reasoning in contrasting the terms “suit” and “claim.” The CGL policy at issue there required the insurers to defend a “suit,” but gave them discretion to investigate and settle a “claim.” (Foster-Gardner, supra, 18 Cal.4th at p. 878.) This court reasoned that the use of these distinct *979 terms “indicates that the insurers’ differing rights and obligations with respect to ‘suits’ and ‘claims’ were deliberately and intentionally articulated in the policies.” (Id. at p. 880.) We further reasoned that a policy’s “careful separation” of the obligations respecting “suits” from those concerning “claims” revealed the drafters’ intention to ascribe differing meanings to the two obligations. (Ibid.) This reasoning applies with equal force to the CGL policy’s careful separation of the obligations respecting defense from those concerning indemnification. One must assume that use of different language to describe the nature and scope of these distinct obligations was deliberate and intentional. In particular, the use of the term “suit” in defining the defense obligation, and its omission from the definition of the indemnity obligation, reveals an intention that the indemnity obligation would be triggered not only by damages awarded in a civil action but also by the very same monetary obligation when imposed by a coercive administrative order. In other words, applying the Foster-Gardner rationale leads to a conclusion contrary to that reached by the majority here.
The majority’s analysis is also inconsistent with this court’s reasoning in Vandenberg v. Superior Court (1999) 21 Cal.4th 815 [88 Cal.Rptr.2d 366, 982 P.2d 229]. At issue there was “whether a [CGL] policy that provides coverage for sums the insured is ‘legally obligated to pay as damages’ may cover losses arising from a breach of contract.” (Id. at p. 824.) Construing this language according to “the meaning a layperson would ascribe to [it],” this court concluded that the policy provided indemnity coverage for the contract claim. (Id. at p. 840.) This court explained that a contrary rule was unacceptable because it would “[p]redicat[e] coverage upon [the] injured party’s choice of remedy or the form of action sought” and thereby “permit the injured . . . party to determine insurance coverage.” (Ibid.) Applying Vandenberg’s logic to the issue here, I would conclude that a layperson would understand the term “damages” to include any sum the insured became legally obligated to pay to remedy harm, whether the legal obligation was established by court judgment or administrative order. The contrary rule, which the majority adopts here, is unacceptable because it permits an administrative agency to determine insurance coverage by its choice of remedy. If the agency proceeds to court to impose the cleanup costs, the indemnity obligation is triggered (AIU, supra, 51 Cal.3d at p. 841), but if the agency uses a coercive administrative order instead, the insured is left without coverage.
In support of its holding that an administrative cleanup order does not trigger a CGL carrier’s duty to indemnify, the majority relies also on this syllogism: (1) A CGL carrier’s duty to defend is broader than its duty to *980 indemnify; (2) administrative agency proceedings do not trigger a CGL carrier’s duty to defend; (3) therefore, an administrative order to pay remediation expenses does not trigger a CGL carrier’s duty to indemnify. (Maj. opn., ante, at pp. 960-961.) The syllogism is logically unsound.
On several occasions, this court has remarked that an insurer’s obligation to defend is broader than its obligation to indemnify, but we have explained that this means only that the insurer must defend a suit “if the complaint shows a potential liability within the policy coverage” (Gribaldo, Jacobs, Jones & Associates v. Agrippina Versicherunges A. G. (1970) 3 Cal.3d 434, 456 [91 Cal.Rptr. 6, 476 P.2d 406], italics in original), even though the insured ultimately prevails in the suit or the damages actually awarded are not within the policy coverage. (See Aerojet-General Corp. v. Transport Indemnity Co. (1997) 17 Cal.4th 38, 59 [70 Cal.Rptr.2d 118, 948 P.2d 909] [defense duty is broader because it “extends beyond claims that are actually covered to those that are merely potentially so”].) Thus this court has used the maxim that the defense obligation is broader than the indemnity obligation to explain why the defense obligation may exist even when the indemnity obligation does not. Before today, this court has never used the maxim to impose an artificial limit on the indemnity obligation.
In the landmark insurance case of Gray v. Zurich Insurance Co. (1966) 65 Cal.2d 263 [54 Cal.Rptr. 104, 419 P.2d 168], this court held that an insurer could have a duty to defend even when there was no duty to indemnify and in the course of explaining this holding we said that the duty to defend “is independent of the indemnification coverage.” (Id. at p. 274.) Because the insurer’s two primary obligations are defined by separate policy provisions that use different language, the scope of each should be assessed separately, without the sort of artificial linkage that the majority imposes. (See Weyerhaeuser Co. v. Aetna Cas. and Sur. (1994) 123 Wash.2d 891, 902 [874 P.2d 142, 148] [“The two duties, to defend and to indemnify, should be examined independently”].) No general rule or maxim can take precedence over the basic principle that the mutual intention of the parties when they formed the insurance contract is controlling. (AIU, supra, 51 Cal.3d at pp. 821-822.) The proper measure of the duty to indemnify is the language of the indemnity provision, construed according to the accepted rules for insurance policies. I have explained why application of those rules leads to the conclusion that the CGL insurer must indemnify its policyholder for the costs of complying with the administrative cleanup order. I would so hold.
It remains to be seen exactly what impact today’s decision will have on the practical operation of insurance coverage for environmental pollution *981 cleanup costs. A CGL policyholder who receives from an administrative agency a demand to clean up pollution that has caused property damage may still look to the carrier for financial assistance, but the policyholder must be careful in phrasing its claim against the carrier. Because the majority here and in Foster-Gardner categorizes an environmental agency cleanup demand or order as a “claim,” the policyholder must invoke the carrier’s obligation to settle claims rather than its obligation to indemnify for damages that the policyholder is legally obligated to pay. If the carrier agrees to “settle” the “claim” by authorizing the policyholder to comply with the administrative order, then it appears that the carrier would be obligated to pay the cost of this “settlement,” subject to policy provisions regarding deductible amounts, coverage limits, and so forth.
If the carrier declines to “settle” the “claim” by providing the policyholder with the funds needed to comply with agency demands, the policyholder has two options. The policyholder may comply with the agency directive by using its own funds and then seek to recover these costs by bringing suit against the insurer, not for breach of the duty to indemnify, but for breach of the duty to accept a reasonable settlement. Although this option achieves a prompt cleanup of the environment, consistent with the goals of environmental protection legislation, it may not be financially or legally attractive to the policyholder. Not only would the policyholder have to fund the cleanup on its own, a task that may be beyond its financial resources, it would also have to assume a difficult burden of proof in litigation against the carrier for breach of the duty to accept a reasonable settlement. The policyholder normally would have to prove, among other things, that failure to accept the “settlement” by compliance with the cleanup demand exposed the policyholder to liability in excess of the policy limits (see Murphy v. Allstate Ins. Co. (1976) 17 Cal.3d 937, 940-941 [132 Cal.Rptr. 424, 553 P.2d 584]) or some other risk of particular harm (see Bodenhamer v. Superior Court (1987) 192 Cal.App.3d 1472, 1478-1479 [238 Cal.Rptr. 177] [even absent risk of an excess judgment, failure to settle may constitute bad faith if it exposes policyholder to adverse consequences, such as loss of business goodwill]).
If the carrier will not fund the policyholder’s costs of compliance with the cleanup order, the policyholder’s other option is to decline to comply with the order, thereby forcing the agency to resort to judicial proceedings that will trigger the carrier’s duty to defend and, should the agency prevail, as it almost invariably does, the carrier’s duty to indemnify. If the cost of complying with the agency’s judgment against the policyholder exceeds the policy limits, the policyholder may sue the carrier for the excess on a theory that the carrier, by declining to accept a reasonable settlement, breached the implied covenant of good faith and fair dealing.
*982 Thus, the majority’s decision does not leave the policyholder faced with an agency cleanup order entirely without remedies against the CGL liability carrier, but because those remedies are not obvious to an unsophisticated policyholder, there is a risk that policyholders will forfeit valuable insurance coverage by failing to promptly invoke the carrier’s settlement obligation. A policyholder astute enough to invoke the settlement obligation may still find itself enmeshed in a complex and tortuous series of legal proceedings before it obtains from the carrier the liability coverage for which it bargained. But the big losers in today’s decision are public health and the environment, because a policyholder’s only financially viable option, should the carrier decline to fund compliance with agency directives, may often be to ignore agency cleanup orders, thereby forcing the government to resort to litigation and delaying effective remediation of environmental pollution.
Werdegar, J., concurred.
The petition of real party in interest Powerine Oil Company, Inc., for a rehearing was denied April 18, 2001. Kennard, J., and Werdegar, J., were of the opinion that the petition should be granted.