**FIREMAN'S FUND INSURANCE COMPANIES and American Insurance Company, Plaintiffs,**

v.

**EX–CELL–O CORPORATION, et al., Defendants.**

**EX–CELL–O CORPORATION, et al., Third–Party Plaintiffs,**

v.

**AIU INSURANCE COMPANY (Successor to American International Insurance Company), et al., Third–Party Defendants.**

**No. 85–CV–71371.**

United States District Court,
E.D. Michigan, S.D.

Jan. 17, 1992.

---

**6.** *See PHE, Inc. v. United States Dept. of Justice,* 743 F.Supp. 15, 27–28 (D.D.C.1990).

See also, 750 F.Supp. 1340, 790 F.Supp. 1339.

Peter B. Kupelian, Tucker & Rolf, Southfield, Mich., for Zurich American Ins. Co.

Paul L. Gingras and Patricia St. Peter, Zelle & Larson, Minneapolis, Minn., John W. Henke III, Stark, Reagan, Troy, Mich., for Wausau Ins. Co.

Herbert G. Sparrow III, Dickinson, Wright, Moon, Van Dusen & Freeman, Detroit, Mich., Barry M. Kelman, Gofrank & Kelman, Southfield, Mich., for Travelers Ins.

Peter A. Metters, Richard C. Sanders, Hill, Lewis, Adams, Goodrich & Tait, Detroit, Mich., Robert B. Webster, Hill, Lewis, Adams, Goodrich & Tait, Birmingham, Mich., Nicholas J. Zoogman, Eugene R. Anderson, Anderson, Russell, New York City, for Ex–Cell–O, McCord and Davidson.

Michael G. Costello, Plunkett & Cooney, Detroit, Mich., Jeffrey Silberfeld, Rivkin, Leff & Radler, Uniondale, N.Y., for American Intern. Ins. Co.

Philip Barber, Anderson, Kill, New York City.

## ORDER ACCEPTING SPECIAL MASTER'S REPORT AND RECOMMENDATION WITH MODIFICATIONS

FEIKENS, District Judge.

The court has reviewed the Special Master's Report and Recommendation submitted in this case and any objections filed thereto. The Report and Recommendation, with the modifications noted below, is hereby accepted as the findings and conclusions of the court.

### Objections

1. In response to defendant Wausau's objections, I make the following modifications to the Special Master's Report and Recommendation:

*Objection #1:* Wausau objects to the reference that the Cardinal Landfill was a "municipal dump." I note that in my August 30, 1990 opinion, as amended, I found:

> During Davidson's first year of operation at the Farmington plant in 1966, it disposed of its wastes at the Farmington town dump. Local citizens complained of dense smoke and odors caused by the burning of Davidson's chemical waste. Davidson asked Ernest Cardinal, who had been hauling its waste to the town dump, to operate a dump exclusively for Davidson. Cardinal had operated a gravel pit adjacent to the town dump for approximately five years; this land now became the Cardinal landfill.

*Fireman's Fund Ins. Companies v. Ex–Cell–O Corp.,* 750 F.Supp. 1340, 1354 (E.D.Mich.1990) (citations omitted).

*Objection #2:* The court finds that the Special Master merely reiterated Wausau's contention that there was no breach before Wausau's refusal to accept the January 6, 1986 tender of defense.

*Objection #3:* The court finds this portion of the Special Master's Report and Recommendation to be a statement of the existing law.

*Objection #4:* The court finds this objection to be without foundation.

*Objection #5:* The court finds this objection points out a distinction without a difference.

*Objection #6:* The court notes this objection but construes the Special Master's Report and Recommendation otherwise.

2. In response to the policyholders' objections, I make the following modifications to the Special Master's Report and Recommendation:

*Objection # 1:* The court notes this objection but directs the policyholders' attention to the Special Master's discussion (*see* Report at 18) of the policyholders' legal memorandum outlining the strategic reasons why an insured may wish to give notice of a claim but delay a tender of defense. The court finds that the existence of that memo, combined with the fact that no formal tender of defense was made until January 6, 1986, means that the policyholders decided on a course of action that they cannot now renounce. Further bolstering this finding, the court notes that the policyholders' October 31, 1984 *notice* letter to Wausau was written in response to a letter from Wausau that asserted the policyholders had not yet given *"notice* to Wausau Insurance Companies and, apparently, is not looking to Wausau Insurance Companies for any indemnity or *defense....*" (emphasis added). It is illuminating that the policyholders were careful to respond to this letter by only giving *notice* to Wausau.

■ *Objection # 2:* The court agrees with the Special Master that it is inappropriate to determine now which consulting fees and hydrogeological studies are reasonable and proper defense costs since the underlying actions initiated by the PRP (potentially responsible party) letters are unresolved. However, the court will retain jurisdiction over these matters until they can be decided.

### Clarifications

Wausau also seeks to clarify certain discrete portions of the Special Master's Report and Recommendation. Rather than refer this matter back to the Special Master, I proceed directly as follows:

*Clarification # 1:* On page 2, lines 9–10, "two other policyholders" should be changed to "two other insurance companies."

*Clarification # 2:* The court finds this clarification request to be without foundation.

*Clarifications # 3 and # 4:* The court is satisfied that these statements are sufficiently characterized as the policyholders' positions, as opposed to conclusions of law by the court, inasmuch as they appear under the heading "1. THE POLICYHOLDERS' POSITION."

*Clarification # 5:* On page 9, line 5, "the insured does not" should be changed to "the insurer does not."

*Clarification # 6:* The court notes that Wausau is not raising "lack of notice" or "late notice" as a defense only to those issues before the Special Master.

*Clarification # 7:* The court notes this clarification request.

ACCORDINGLY, IT IS ORDERED that:

1. Defense costs proximately caused by Wausau's breach of its contractual duty to defend include only those costs incurred after the tender of defense;

2. Any defense costs incurred by the policyholders prior to the tender of defense were voluntarily made;

3. The policyholders' tender of defense was first made on January 6, 1986;

4. Defense costs include not only those reasonable and necessary to defeat or limit liability but also those costs, including consulting fees, that are reasonable and necessary to limit the scope and/or costs of remediation, even if similar or identical studies have been ordered by the government.

5. This court exercises its discretion not to undertake the task of determining which consulting fees and hydrogeological studies are reasonable and proper defense costs since the underlying actions initiated by the PRP letters have not yet been resolved. This court will retain jurisdiction over these matters until the necessary facts and circumstances develop for a meaningful determination of this issue.

6. After a review and summation of the defense costs that fall within the scope of

the above determination, final judgment shall be entered.

IT IS SO ORDERED.

## SPECIAL MASTER'S REPORT AND RECOMMENDATION

PEPE, United States Magistrate Judge.

### I. BACKGROUND

*Certain policyholders involved in this suit responded to administrative action taken pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq., and similar state statutes.*

The policyholders received notices that they may be potentially responsible persons for environmental contamination at various sites. Employers Insurance of Wausau, a Mutual Company ("Wausau"), was the primary carrier from 1970 to 1979 for the four sites involved in this case. The parties to this action include the following: (1) Ex–Cell–O Corporation ("Ex–Cell–O"), a corporation organized under the laws of the State of Delaware with its principal place of business in Walled Lake, Michigan, (2) McCord Corporation ("McCord"), a corporation organized under the laws of the State of Michigan with its principal place of business in Troy, Michigan, and (3) Davidson Rubber Company, Inc. ("Davidson"), a corporation organized under the laws of the State of Delaware with its principal place of business in Dover, New Hampshire. Davidson is the predecessor in interest to Davidson Textrol, Inc. It is a wholly owned subsidiary of McCord, which is a wholly owned subsidiary of Ex–Cell–O.

Fireman's Fund Insurance Companies and American Insurance Company filed this suit for declaratory judgment against the insured, Ex–Cell–O, McCord, Davidson, and two other insurance companies, Travelers and Wausau. The policyholders filed a third-party complaint seeking declaratory judgment against Travelers, Wausau, and certain other insurers. The parties are seeking a declaration of rights and obligations under comprehensive and general liability and excess liability insurance poli-

cies involved in this litigation. The other parties, including the several excess carriers, have now resolved their disputes.

The policies still at issue in this case were issued to McCord, with Davidson covered as a named insured. The policy numbers involved are as follows:

| Company | Policy Number | Policy Period |
| --- | --- | --- |
| Wausau | 1721 00 040499 | 1/1/70–1/1/71 |
| | 1722 00 040499 | 1/1/71–1/1/72 |
| | 1723 00 040499 | 1/1/72–1/1/73 |
| | 1724 00 040499 | 1/1/73–1/1/74 |
| | 1725 00 040499 | 1/1/74–1/1/75 |
| | 1726 00 040499 | 1/1/75–1/1/76 |
| | 1727 00 040499 | 1/1/76–1/1/77 |
| | 1728 00 040499 | 1/1/77–1/1/78 |
| | 1729 00 040499 | 1/1/78–1/1/79 |

Davidson operated a plant in Farmington, New Hampshire beginning in 1966. It manufactured instrument panels, bumpers, fascia and other automobile accessories, which resulted in various solid and liquid wastes. The groundwater under the plant and neighboring properties was contaminated with various volatile organic compounds of the type utilized in the plant's manufacturing process. Adjacent to the town of Farmington, New Hampshire, is the Cardinal Landfill, the municipal dump where various liquid and solid wastes generated by Davidson were disposed. Other portions of the waste were deposited at the City of Dover Municipal Landfill in Dover, New Hampshire. The Ottati & Goss/Kingston Steel Drum site in Kingston, New Hampshire, was used as a drum reconditioning operation to which the Dover and Farmington plants sent some of their 55–gallon drums for reconditioning. These four New Hampshire sites are the remaining sites in dispute.

In an earlier determination, this Court found that the duty to defend under the relevant Wausau policies was separate from the duty of indemnification, and that there existed a duty to defend under these insurance policies because the type of administrative environmental actions involved in this case fell within the meaning of the term "suit" in the relevant policies. The bench trial on the question of indemnification resulted in a ruling that the insurers did not have a duty to indemnify the policyholders. The Court later determined that the duty to defend terminated with the

Court's declaratory judgment that Wausau was not liable for any indemnification. The relevant facts involved in the litigation are set forth in detail in the Court's Memorandum Opinion of August 30, 1990, as amended November 19, 1990. *See Fireman's Fund Ins. Co. v. Ex–Cell–O Corp.*, 750 F.Supp. 1340 (E.D.Mich.1990).

The matter was referred to me as a Special Master for determination of the appropriate defense costs in this matter. The factual issue for the Special Master is to determine the total amount of reasonable defense costs allocated to Wausau.[1]

Subject to certain minor modifications in the Joint Pre–Trial Statement Regarding Determination of Defense Costs, the policyholders have provided two separate claims for defense costs:

Defense Costs Sought as of March 31, 1989[2]

| | |
|---|---:|
| Cardinal Landfill | $ 694,070.88 |
| Davidson, Farmington, N.H. | 408,268.99 |
| Dover Municipal Landfill | 858,965.20 |
| Ottati & Goss/Kingston, N.H. | 4,099.03 |
| | $1,965,404.00 |

Supplemental Defense Costs from April 1, 1989—August 30, 1990

| | | |
|---|---|---:|
| Cardinal Landfill | | $ 593,155.15 |
| Davidson | | 225,348.75 |
| Dover Municipal Landfill | | 64,815.78 |
| Ottati & Goss/Kingston | | 37,045.53 |
| | | $ 920,365.21 |
| | Total | $2,885,769.21 |

This Report and Recommendation shall deal with determining which categories of defense costs for legal and investigative expenses should be awarded in this declaratory judgment action. A follow-up report will finalize the exact dollar amount of defense costs in each category.

## II. ANALYSIS OF SUBSTANTIVE ISSUES

Various legal issues have arisen regarding the claim for defense costs. They include:

1. Under the Court's Memorandum Order of July 31, 1987, granting partial summary judgment, *Fireman's Fund Ins. Co. v. Ex–Cell–O Corp.*, 685 F.Supp. 621, 626 (E.D.Mich.1987), Wausau's pro rata share of defense costs is its period of coverage divided by the total period of the policyholder's *alleged* use of the site.

2. Earlier claims for defense costs involving the Keefe Environmental Services, Silresim Chemical Company, and Charles George Landfill sites have been withdrawn, resulting in a reduction of defense costs in the amount of $311,222.19. The policyholders have withdrawn claims for attorney fees in the amount of $36,976.43 due to

1. Whether the policyholders can receive defense costs prior to notice to Wausau;

2. Whether defense costs can be obtained prior to the time that the policyholders specifically made a formal demand or tender of defense to Wausau against the third-party litigation;

3. Whether costs of investigation incurred by the policyholders in the underlying environmental actions are payable as

a earlier mathematical error double counting invoices and fees. They withdrew $69,922.51 for certain studies done at the Farmington plant site not related to investigation of the claims involved in the underlying actions. They also withdrew $16,325 for attorney fees related to a project to close the waste water lagoons on the Farmington plant site. The policyholders added an additional claim of $41,744.65 based on newly discovered invoices, and have added additional claims for investigative costs in an undetermined amount. They also reinstated an attorney fees claim for $784 that was previously withdrawn inadvertently.

defense costs under Wausau's duty to defend; and

4. Whether certain legal services and expenses provided to the policyholders by their counsel in the underlying environmental actions constitute defense costs.

Wausau contends that many of the costs incurred by the policyholders in compliance with government regulatory orders are not defense costs but rather remedial costs that would have been covered only if indemnification had been ordered. Wausau further asserts that the policyholder's contributions to a settlement with the government in connection with the Dover Municipal Landfill is not a defense cost. Wausau contends that it is liable for no costs prior to the tender of defense, and surely for no costs incurred by the policyholders prior to Wausau having been given notice of the government's claims. Finally, Wausau challenges that certain miscellaneous specific items do not constitute defense costs.

### A. DEFENSE COSTS PRIOR TO NOTICE AND PRIOR TO TENDER OF DEFENSE:

The policyholders seek $497,632.90 in consulting fees and $123,347.86 in attorney's fees, for a total of $620,980.76, for costs incurred in connection with the four sites before Wausau was tendered the defense on January 6, 1986 (September 18, 1989, Amended Statement of Defense Costs).

#### 1. THE POLICYHOLDERS' POSITION

The policyholders claim a right to defense costs that were incurred prior to the time Wausau was given notice of the legal environmental actions against them. The policyholders argue that these defense costs are payable because the Court ruling that the policies cover "any effort to impose on the policyholders a liability enforceable by a court," including "actual or threatened use of legal process to coerce payment or conduct by a policyholder" is a determination that the duty to defend is triggered by such governmental action. *Fireman's Fund Ins. Co. v. Ex–Cell–O Corp.*, 662 F.Supp. 71, 74–75 (1987). The policyholders cite this Court's order in *Ray Indus., Inc. v. Liberty Mutual Ins. Co.*, 728 F.Supp. 1310, 1320 (E.D.Mich.1989) for the proposition that "the duty to defend was triggered on the date [the policyholder] received the EPA's PRP letter ..." regarding environmental claims at the sites. The policyholders note that the standard form contracts of insurance with Wausau required payment of reasonably foreseeable damages resulting from its failure to defend the policyholders. These damages would include all costs of defense against third-party claims, and not merely those defense costs incurred subsequent to notice to Wausau.

The policyholders contend that the specific language of the insurance policies does not require the sending of notice of litigation to trigger the duty to defend. The policies do not require notice to the insurer before the policyholder can incur any defense costs. Unlike some states,[3] Michigan does not have a statute requiring a demand on the insurance company prior to triggering the obligation of the insurance company to cover defense costs. The policyholders argue that to the extent that an insurance policy is ambiguous as to the scope of the duty to defend, such ambiguity must be construed against the insurance company. *See Iacobelli Constr. Co. v. Western Cas. & Sur. Co.*, 130 Mich.App. 255, 343 N.W.2d 517 (1983). The policyholders note that the purpose of notice provisions in insurance contracts under Michigan law is to allow the insured to make "a timely investigation in order to evaluate claims and to defend against fraudulent, invalid, or excessive claims." *Wendel v. Swanberg*, 384 Mich. 468, 477, 185 N.W.2d 348 (1971). They contend that only if Wausau can demonstrate that it was prejudiced because of the timing of the notice in its ability to investigate, defend, or settle the underlying

---

**3.** *See Gribaldo, Jacobs, Jones & Assoc. v. Agrippina Versicherunges A.G.,* 3 Cal.3d 434, 91 Cal. Rptr. 6, 476 P.2d 406, 448–49 (1970) (insurance company not liable for defense costs where the policy prohibited the policyholder from incurring defense costs without insurance company's prior consent and where a California statute requires a policyholder to make a demand upon the insurance company before incurring defense costs).

claims can it raise late notice as a defense to the policyholders' claims for costs.[4]

The policyholders also assert that the issue of prejudice was resolved against Wausau in this case when the Court rejected Wausau's prejudice defense in granting partial summary judgment on defense costs to the policyholders. 662 F.Supp. 71, 77 (1987); 685 F.Supp. 621, 626 (1987). Wausau, in their July 21, 1986, Memorandum of Law in Opposition to Motion [of Policyholders] for Partial Summary Judgment, had argued that the late notice to Wausau caused prejudice which would defeat insurance coverage. When this Court granted the policyholders' motion for partial summary judgment on May 17, 1987, the Court implicitly found against Wausau on this late notice issue.

■ The policyholders acknowledge that the insurance policies require notice when a claim is made or a suit is brought against the insured. They further acknowledge that Michigan cases have required a policyholder to "request" a defense from its insurance company in order to be entitled to a defense. Yet, they assert that the timing of this condition precedent to the duty to defend does not affect the scope of the insurer's duty absent a showing of prejudice. They note there are no Michigan cases limiting damages to those defense costs incurred subsequent to notice from the policyholder. Thus, the policyholders argue that the January 6, 1986, formal request for defense costs would be adequate to fulfill the contract's condition precedent entitling them to defense costs both before and after the demand. The policyholders also contend in the alternative that, if the Court determines that only those defense costs after tender are to be reimbursed, then the earlier notice letter to Wausau of October 31, 1984, constituted a request for a defense from Wausau and

should establish the tender of defense date. This letter gave notice of potential claims arising out of hazardous waste contamination at the respective sites and stated that the letter was not to be construed as a waiver of claims against Wausau under their policies of insurance. The policyholders argue that they are entitled to the traditional contract measure of damages for the insurer's breach of contract in failing to perform its duty to defend. In Michigan, a breaching party is liable for foreseeable damages flowing from the failure to perform, which includes those damages that were "in the contemplation of the parties at the time the contract was made." *Kewin v. Massachusetts Mut. Life Ins. Co.*, 409 Mich. 401, 295 N.W.2d 50 (1980). In this case, such damages include attorney fees and other costs incurred in the policyholders' defense of third party actions of the EPA and the respective New Hampshire health and environmental agencies. *Stockdale v. Jamison*, 416 Mich. 217, 224, 330 N.W.2d 389 (1982); *Schiebout v. Citizens Ins. Co. of America*, 140 Mich.App. 804, 366 N.W.2d 45 (1985).

### 2. WAUSAU'S POSITION

Wausau notes that the policies in question specifically provide:

Insured's Duties in the Event of Occurrence, Claim or Suit

(b) If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.

(c) ... The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of accident.

---

**4.** In Michigan, late notice to an insurer is not a defense to *coverage* unless the insurer can demonstrate that it had been prejudiced by the delay. *Wendel*, 384 Mich. at 478, 185 N.W.2d 348. *See also Wehner v. Foster*, 331 Mich. 113, 117, 49 N.W.2d 87 (1951). In determining whether prejudice has occurred, courts have considered whether the delay prevented the insurer from adequately investigating the accident or occur-

rence, *Wehner*, 331 Mich. at 122, 185 N.W.2d 348; from participating in settlement negotiations, *Kermans v. Pendleton*, 62 Mich.App. 576, 582, 233 N.W.2d 658 (1975), *Bibb v. Dairyland Ins. Co.*, 44 Mich.App. 440, 446, 205 N.W.2d 495 (1973); or from protecting its rights to pursue claims against third parties, *Grand Rapids Auctions v. Hartford Acc. and Indem.*, 23 Mich.App. 389, 395, 178 N.W.2d 812 (1970).

It contends that not only must notice be given to Wausau before a duty to defend arises, but that the actual defense must be requested or tendered to Wausau before there can be a breach of contract resulting in any damages. It asserts that any expenditures undertaken by the insured policyholders prior to the tender of defense are "voluntarily made" under the policy, and that the insurer does not assume any obligation with regard to these pre-tender expenses. Wausau contends that adequate tender was not made in this case until the letter of January 6, 1986, to Wausau from Walter Vashak, Ex–Cell–O's assistant general counsel, which stated:

> This letter will constitute Ex–Cell–O Corporation's formal request for reimbursement of defense costs incurred by Ex–Cell–O and Davidson in connection with the Farmington, Cardinal, Keefe and Dover hazardous waste sites and will further constitute our formal request for future defense in connection with these matters.
>
> \* \* \* \* \* \*
>
> After you have had an opportunity to review the contents of my letter to [Travelers] and the foregoing, I suggest that a meeting be arranged to discuss the defense of Davidson and Ex–Cell–O by Travelers and Wausau.

Wausau contends that Vashak's earlier letter of notice to Wausau on October 31, 1984, did not request a defense of Wausau or ask for the insurer's assistance in any manner.

Wausau refers to a memorandum obtained in discovery related to Fireman's Fund, the prior insurance carrier on the sites, regarding whether to tender a defense. While the memorandum related to an earlier period of coverage by a different carrier, the memorandum shows the tactical reasons once considered by the policyholders for holding off a tender of defense. The memorandum outlines various strategic considerations: (1) Delay the formal tender of defense to the insurer to control the negotiation with an opponent whose hopes as to insurance coverage have not been raised. The risks of delay are that the insurer will later second-guess each move that the insured made and delayed tender provides no early assurance that insurance coverage will ultimately be provided; (2) While an early tender allows the insured to find out whether their insurer will provide or contest coverage, the tender of defense runs the risk the policyholders would: (i) lose control of the events to the insurer, (ii) be provided with "undesirable counsel" chosen by the insurer, and (iii) possibly be required to litigate against the insurer if there is a refusal of coverage.

Wausau makes clear that it is not raising "lack of notice" or "late notice" as a defense to coverage and thus to the duty to defend. Rather, it is asserting that voluntary defense activities by the insured before tendering the defense to the insurer are not within the scope of the duty to defend, because, in part, such voluntary payments were made prior to any wrongful refusal or breach of the contract by Wausau. Thus, Wausau asserts that it is not liable in damages for any expenditures voluntarily undertaken[5] by the policyholders prior to tendering the defense to the insurance company, because these expenditures were undertaken by the policyholders prior to any time at which they could claim that there had been a breach of Wausau's duty to defend.

■ Damages for breach of contract attempt to put the injured party in as good a position as that party would have been if performance had been rendered as promised by the awarding of a sum equivalent to the performance of the bargain. *Maraldo Asphalt Paving, Inc. v. Harry D. Osgood Co.*, 53 Mich.App. 324, 220 N.W.2d 50 (1974); *Tann v. Allied Van Lines, Inc.*, 5

---

5. The policyholders respond that these payments were not voluntarily made, but were payments coerced by governmental authority. While it is true that there may be a coercive element in undertaking defense costs to a traditional law suit, the reality remains that the policyholders have had a choice of (i) requesting the insurer to pay such investigative costs that were demanded by the government or (ii) voluntarily choosing to pay them themselves without any special notice or request for tender of defense to the insurer.

Mich.App. 309, 146 N.W.2d 682 (1966). The effort to put the injured party in as good of a position as that party would have enjoyed had there been full performance of the contract is to be done at the least cost to the defendant, without charging the defendant with harms that the defendant had no reason to foresee when the contract was made. *Brodsky v. Allen Hayosh Indus., Inc.,* 1 Mich.App. 591, 137 N.W.2d 771 (1965). Damages for breach of contract are those which may fairly and reasonably be considered as arising naturally from the breach itself or which may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of a breach. *Miholevich v. Mid–West Mut. Auto Ins. Co.,* 261 Mich. 495, 246 N.W. 202 (1933); *Groh v. Broadland Builders, Inc.,* 120 Mich.App. 214, 217, 327 N.W.2d 443 (1982) (citing with approval *Hadley v. Baxendale,* 9 Exch. 341; 156 Eng.Rep. 145 (1854); 5 Corbin, Contracts, § 1007, at 70–73; *Kewin v. Mass. Mut. Life Ins. Co.,* 409 Mich. 401, 414, 295 N.W.2d 50 (1980)). Wausau contends there was no breach before its refusal to accept the January 6, 1986, tender of defense.

Other cases in actions for breach of contract, such as breach of warranty under the Uniform Commercial Code, hold specifically that the damages must be proximately caused by the breach. *See e.g., Murphy v. Eaton, Yale & Towne, Inc.,* 444 F.2d 317, 327 (6th Cir.1971) (citing *Erdman v. Johnson Bros. Radio & Television Co.,* 260 Md. 190, 271 A.2d 744, 747, 749 (Ct. of App. 1970)). *See also Uniform Commercial Code* § 2–314 and Comment 8 to § 2–316; *Fred J. Miller, Inc. v. Raymond Metal Prod. Co.,* 265 Md. 523, 290 A.2d 527, 530 (Md.1972) (citing *Erdman* ).

### 3. ANALYSIS

■ There is a split of authority on whether notice alone triggers the duty to defend, or whether the insured must also tender the defense either formally or in some informal fashion that indicates a desire for the insurer to undertake the defense. In an earlier opinion, this Court determined that Michigan law applies to

this dispute. 750 F.Supp. at 1346. There is no Michigan case law, however, directly on point in which the insured party gave notice of a lawsuit or impending litigation, undertook its own defense for a period, and thereafter formally tendered the defense to the insurer which was refused. Three Michigan cases suggest that in certain contexts a tender of defense is necessary. Cases in other jurisdictions suggest that, at least among sophisticated parties, the insured must formally tender a defense to trigger an obligation of the duty to defend.

In *Detroit Automobile Inter–Ins. Exchange (DAIIE) v. Higginbotham,* 95 Mich. App. 213, 290 N.W.2d 414 (1980), the insured party hit the vehicle of his wife and thereafter assaulted her with a gun. Before filing the lawsuit, and then again after filing it, the wife notified the automobile insurance carrier of her claims against her husband, both for the vehicle collision and the assault against her. The husband failed to cooperate, refused an offer of the insurance company to defend under a reservation of right, and ultimately had a default judgment entered against him. The insurance company moved to vacate the default and also brought a declaratory judgment action against the insured and his wife. In Michigan, as in other states, a wrongful refusal to undertake the duty to defend estops the insurance company from thereafter denying coverage. The wife sought to estop the insurance company in this case from denying coverage, asserting their wrongful denial of a duty to defend. The Court of Appeals found that the insurance company did not breach its duty to defend because "[a]bsent a request, an insurer has no duty to defend an insured." *DAIIE,* 95 Mich. at 217, 290 N.W.2d 414 (citing *American Mut. Liability Ins. Co. v. Michigan Mutual Liability Co,* 64 Mich. App. 315, 323, 235 N.W.2d 769 (1975), *Eastman v. United States,* 257 F.Supp. 315, 319 (S.D.Ind.1966)).

In *American Mutual Liability Ins. Co.,* cited by the *DAIIE* court, it was again not the insured party that sought the defense. In *American Mutual,* Donald Barden, a truck driver of Graff Trucking Company, was injured while delivering a truckload of

paper pulp to the Kalamazoo Paper Company. Barden was injured while assisting one of Kalamazoo Paper's employees, Edward Shallhorn, who was operating a forklift owned by Kalamazoo Paper at the time of the injury. Barden filed a worker's compensation claim against his employer, Graff Trucking, which was insured by Michigan Mutual. Barden also sued Kalamazoo Paper, which was insured and defended by American Mutual. The personal injury suit ultimately settled. Kalamazoo Paper's insurer, American Mutual, brought a declaratory judgment action against Michigan Mutual under a novel theory that the general automobile policy issued to the Graff Trucking Company should have provided coverage not only for Graff Trucking but also for Kalamazoo Paper and its employee, Shallhorn, who attempted to help unload Barden's truck. American Mutual contended that Shallhorn used the Graff truck with the permission of its employee, Barden, when Barden was injured. Thus American Mutual argued that Kalamazoo Paper, by the actions of its employee, Shallhorn, fell within the definition of an insured under Michigan Mutual's policy for Graff Trucking. The trial court found that for purposes of unloading the pulp, Barden (Graff Trucking's regular employee) was also operating as a Kalamazoo Paper employee under the Michigan economic reality test. Thus, Barden's injuries fell under the workmen's compensation exclusion in Graff Trucking's policy not only for this claims against his actual employer, Graff Trucking, but also for his claims against Kalamazoo Paper, his imputed "employer" during the unloading operation.

American Mutual (Kalamazoo Paper's insurer) maintained in the alternative that Michigan Mutual (Graff Trucking's insurer) should be estopped from asserting that Barden was a Kalamazoo Paper employee at the time of the accident, because an employee could not have sued Kalamazoo Paper in the circuit court, as Barden had successfully done. American Mutual argued that because Michigan Mutual refused to defend Kalamazoo Paper in the Barden/Kalamazoo lawsuit, it should be estopped from challenging any of the direct

or *implicit facts* related to that lawsuit, to wit, that Barden was *not* an employee of Kalamazoo Paper.

The Michigan Court of Appeals acknowledged the general principle that an insurer's wrongful refusal to defend an action against its insured will render the insurer liable for costs and attorney fees. It did not need to reach the question of whether Michigan Mutual was bound by the "attendant factual determinations of that case ... i.e., that Barden was not a Kalamazoo employee." It noted that:

> There is nothing in the record before us to suggest that Michigan Mutual was ever requested to defend Kalamazoo in the Barden–Kalamazoo litigation. Absent a request, an insurer has no duty to defend an insured.

In *Celina Mut. Ins. Co. v. Citizens Ins. Co.*, 133 Mich.App. 655, 662, 349 N.W.2d 547 (1984), the court of appeals again noted that "ordinarily an insurer has no duty to defend absent a request to defend."

Similarly, Appleman's treatise on *Insurance Law and Practice* explains:

> The right to a defense ... depends upon conditions precedent as well as the conditions subsequent which must be met by the insured before the right to a defense by the insurer matures in favor of the insured, and the insured must request that the insurer undertake the defense in accordance with the conditions of the policy.

7C Appleman, *Insurance Law and Practice* (Berdal ed.) § 4682 at 24, (footnotes omitted).

California more recently has held that "an insurer must furnish a defense when it learns facts creating potential liability." *Giddings v. Industrial Indem. Co.*, 112 Cal.App.3d 213, 217, 169 Cal.Rptr. 278, 280 (1980). I do not believe that the Michigan Supreme Court would follow this position, at least with respect to a sophisticated insured party, such as the policyholders in the present case. As noted by the Seventh Circuit in *Hartford Accident & Indem. Co. v. Gulf Ins. Co.*, 776 F.2d 1380, 1382 (7th Cir.1985), interpreting Illinois law:

Ordinarily ... before an insurer will be required to provide a defense or risk estoppel, the insured—or at least an insured that is knowledgeable and sophisticated—must tender the claim. As this court has stated, "The defense obligation is triggered when the insured tenders the defense of an action against it which is potentially within the policy coverage." *Solo Cup v. Federal Insurance Co.*, 619 F.2d 1178, 1183 (7th Cir.1980).

The Seventh Circuit thereafter reasoned:

This case differs from *Aetna Casualty v. Coronet [Insurance Co.]*, 44 Ill.App.3d 744, 749, 3 Ill.Dec. 371, 374, 358 N.E.2d 914, 917 (1976), and *Elas v. State Farm [Mutual Auto Insurance Co.*, 39 Ill. App.3d 944, 947, 352 N.E.2d 60, 62 (1976)], where the insured requested a defense and was turned down.

This case also differs from *Aetna* and *Elas* in that the insured in those cases was an individual unaccustomed to the complexities of litigation. Here the insured is a large and sophisticated governmental entity that is advised and assisted by its own counsel, who is a City official.... clearly tender by a sophisticated city requires something more than a letter from a rival insurance company 10 months after the process of litigation has begun.

\*    \*    \*    \*    \*    \*

What is required is knowledge that the suit is potentially within the policy's coverage coupled with knowledge that the insurer's assistance is desired. An insurance company is not required to intermeddle officiously where its services have not been requested.

*Id.* at 1383.

To hold that the tender of defense constitutes the triggering device for a duty to defend is consistent with other opinions holding that mere knowledge by the insurer that the insured has been sued or is about to be sued is not sufficient. *See, e.g., Eastman v. United States*, 257 F.Supp. 315, 319 (S.D.Ind.1966); *Gribaldo, Jacobs, Jones & Assoc. v. Agrippina Versicherunges, A.G.*, 3 Cal.3d 434, 91 Cal.Rptr. 6, 476 P.2d 406 (1970); *Nationwide Mut.*

*Ins. Co. v. General Accident, Fire & Life Assurance Corp.*, 23 Ohio App.2d 263, 265–267, 52 O.O.2d 416, 417–418, 262 N.E.2d 885, 887 (1970); *Payton v. St. John*, 188 So.2d 647, 652 (La.Ct.App.1966); *Solo Cup Co. v. Federal Ins. Co.*, 619 F.2d 1178, 1183 (7th Cir.1980). Cf. *ODA v. Highway Ins. Co.*, 44 Ill.App.2d 235, 194 N.E.2d 489, 499 (1963) (insurance company need not become "intermeddler in the contests of others").

In light of the rulings in *DAIIE*, *American Mut.* and *Celina Ins.* by the Michigan Court of Appeals, the sound reasoning of Appleman in his treatise on insurance law, and *Hartford Accident* and the other cases cited above, I believe that the Michigan Supreme Court would, at least among sophisticated parties, require a tender of defense before the duty to defend arises.

While it is true in the present case that Wausau denied coverage, it has been held in other courts that a *denial of coverage* does not constitute a *refusal to defend* and therefore does not waive the necessity for a tender of defense. In *Aetna Casualty & Sur. Co. v. PPG Indus., Inc.*, 554 F.Supp. 290, 295 (D.Ariz.1983), interpreting Arizona law, the federal district court noted that the doctrine of futility would apply, and excuse a tender of defense, if there had been a prior tender of defense and an express refusal to defend between the same insurer and insured if the prior case involved the same issues. Yet, the insurer's mere allegation that there was no coverage did not excuse the need for a formal tender. In *Manny v. Estate of Anderson*, 117 Ariz. 548, 574 P.2d 36 (Ct.App.1977), the insurer made repeated denials of coverage, but the insurer never expressly refused to defend because "the insured did not tender the defense." The federal court in *PPG Industries* noted that:

*Manny* clearly holds that a denial of coverage does not constitute a refusal to defend and indicates the requirement of a tender of defense is not to be taken lightly.

*Id.* It is only where an insurer expressly refuses to defend an insured in a first action and thereafter a second action is commenced involving substantially the

same issues, that a tender of defense in the second action is unnecessary. *See also Coronado Co. v. Jacome's Dept. Stores, Inc.,* 129 Ariz. 137, 629 P.2d 553 (Ct.App.1981); *Butler Bros. v. American Fidelity Co.,* 120 Minn. 157, 139 N.W. 355 (1913); *Utility Ins. Co. v. Smith,* 129 F.2d 798 (10th Cir. 1942).

■ The difference in outcome between the *Manny* case and the *PPG Industries, Butler Bros.,* and *Smith* cases turns on whether there had been a prior breach of contract. An insurer who merely expresses an opinion that the matter is not covered under the terms of the policy has not yet breached the contract. But where a tender of defense has been denied by the insurance company, the contract has been breached and a second follow-up tender of defense is unnecessary in a subsequent suit involving substantially the same issues. In the present case, there was no breach of the contractual duty to defend until Wausau specifically refused the January 6, 1986, tender of that defense. I believe that the Michigan Supreme Court would find that a denial of coverage does not constitute a refusal to defend for the reasons set forth in the *PPG Industries, Manny,* and other Arizona cases cited above.

■ While notice alone, without a specific tender of defense, followed by a denial of coverage may, in Michigan, constitute a breach of the duty to defend for *unsophisticated* policyholders, in the present case we are dealing with *sophisticated* policyholders who had available both in-house and outside legal advice. Thus, in the present case, there is no reason to waive the tender of defense as a condition precedent to the insurance company's duty to defend.

The policyholders cite Magistrate Judge Goldman's Report and Recommendation, thereafter accepted by District Judge Stewart Newblatt, in *Higgins Indus., Inc. v. Fireman's Fund Ins. Co.,* 730 F.Supp. 774 (E.D.Mich.1990), which reached a different conclusion. In *Higgins Indus.,* the Court considered whether the claim of untimely notice affected Higgins' claim for defense costs. Magistrate Judge Goldman addressed the question as to whether "the obligation to pay defense costs only arises upon receipt of notice" and whether "the insurer was obligated to reimburse Higgins for any defense costs incurred up to the date that notice was actually given" (Report and Recommendation at 16).

To the extent that *Higgins Industries* reads Michigan's late notice cases to require a showing of prejudice to avoid pre-notice defense costs,[6] I believe that *Higgins Industries* is wrong. Michigan courts have held that late notice is a defense to the duty to indemnify only if the insurer can demonstrate prejudice in its ability to defend and defeat the award that is being sought to be indemnified. Yet, the issue in these cases is whether the insured does or does not have the *status* of being covered with indemnity protection for past wrongdoing. Questions of one's insured *status* must be answered with either a "yes" or a "no". The resolution of the issue is nondivisible. On the other hand the computation of defense costs relates both to past and future actions involved in the defense of a case. It is divisible. An insured can waive some past defense cost coverage without waiving future coverage. Unlike one's indemnity status for a past wrong, computation of defense costs can be allocated or divided along a time line. The moment of tendering the defense is the critical point in such a calculation. Because defense costs are more reasonably subject to allocation, an insured can waive part of its right to a defense without waiving it all.[7]

---

**6.** It seems that the issue of whether voluntary pre-*notice* defense costs are waived has an easier resolution than post-notice/pre-tender defense costs. *See e.g., also Gully & Assoc. v. Wausau Ins. Cos.,* 536 So.2d 816 (La.Ct.App. 1988) (insurer has no liability for costs incurred before it receives notice of suit); *Cobb v. Empire Fire & Marine Ins. Co.,* 488 So.2d 349 (La.Ct.App. 1986);

**7.** This logic is clearer if one considers, by analogy, the right to automobile use and services instead of the right to legal defense and hydrogeological testing services. Many automobile dealers offer extended care automobile warranties that entitle the car owners to both (i) warranty repair services and (ii) the use of a substitute car while his car is repaired. If a car

As noted in the policyholders' legal memorandum regarding the Fireman's Fund insurance coverage, there are several strategic reasons why an insured party may wish to give notice of a claim but delay a tender of defense. The insured could then maintain control over the selection of counsel, the strategic course of events, and have greater control over the ultimate settlement by having its own counsel defend.

*Higgins* relies in part on the Sixth Circuit opinion in *West Bay Exploration Co. v. AIG Specialty Agencies*, 915 F.2d 1030 (6th Cir.1990), where the insured received notice of non-compliance in October 1985, and filed no claim upon their insurance company until a suit was filed on October 27, 1987. I believe that *Higgins* reads *West Bay* too broadly. The Sixth Circuit in *West Bay* found that Michigan law required a showing of prejudice before late notice would eliminate an insurer's obligation under a policy.

Both the *Higgins* court and the *West Bay* court ignore the three Michigan cases, *DAIIE, American Mut.*, and *Celina Ins. Co.*, which found that there exits no duty to defend absent a request to defend. The cases relied on by the Sixth Circuit in *West Bay*, all dealt with the *status* of whether the party was insured and did not specifically address the issue as to whether delay in making a demand or tender of defense constituted a partial waiver of fees and expenses incurred prior to that point. The Sixth Circuit in *West Bay* was not dealing with the same question that is presently before the Court. Rather, it was dealing with a delay in notice to the insurance carrier at a time when the insured was seeking to have the carrier pay for clean-up costs "incurred as a result of the BTEX [benzene, ethylbenzene, toluene, and xylene] discharge." 915 F.2d at 1033. While the Sixth Circuit quoted the law on prejudice for denial of coverage, it upheld a denial of coverage because the lower court found that there was prejudice to the insurance company. Thus, the Sixth Circuit did not address the issue of whether there could be a partial waiver of defense costs by an insured who chose to undertake a defense itself instead of tendering the defense to its carrier.[8]

owner brings in a car for warranty service and does not immediately request a free substitute car, but chooses instead to rent one, that car owner could not thereafter demand to be reimbursed for the "voluntary" car rental. The car owner may have wanted more control over the choice and quality of the substitute car than taking the dealer-provided car. Absent perchance some prejudice to the dealer, private rental of a substitute car for a few days would not waive the car owner's right later to demand a substitute car from the dealership issuing the extended warranty. Yet, a car owner who made a tardy demand for a dealer-provided substitute car would have waived the right to such a car prior to making the demand. If the car owner's tardy demand for a substitute car were wrongfully denied, the damages would only cover post-demand car rental costs, not those voluntarily incurred before the demand was made.

8. Plaintiff also cites the First Circuit case of *Liberty Mutual Ins. Co. v. Continental Casualty Co.*, 771 F.2d 579 (1st Cir.1985), for the proposition that pre-tender but post-notice pre-litigation costs can be allowed as damages for a breach of a duty to defend. Unlike the present case, *Liberty Mutual* was a more traditional lawsuit involving the window problems in the Hancock Tower in Boston. H.H. Robertson Company was the installer of the glass panels constituting the "curtain wall" on the outside of the Hancock building. It was insured by Continental. By the spring of 1973, it was clear that the Hancock building had a serious problem with numerous glass panels being blown out and onto the streets below. On June 1, 1973, Robertson notified Continental by letter that John Hancock Mutual Life Insurance Company, the owner of the building, considered Robertson to be in breach of contract. Robertson also noted that it would present to Continental any claims for personal injuries or property damage arising out of the failure of the glass panels. On June 8, 1973, Continental's agent responded that no claims for personal injury or property damage had been filed and suggested the policy might not cover a contract claim by John Hancock, a co-insured under the policy. Interpreting this response as a firm statement that Continental would not defend Robertson against a contract claim by John Hancock, it sought separate counsel. Two years later, in September 1985, John Hancock sued Robertson in state court, at which time Continental formally refused to defend Robertson in that action. In 1982, Robertson settled that and another suit involving the windows for 2.6 million dollars. Thereafter, a Massachusetts court ruled in a declaratory judgment action that Continental did have to defend Robertson; this ruling was ultimately upheld by the highest court in Massachusetts.

The issue facing the First Circuit was whether or not the fees and expenses incurred were

Finally, the policyholders argue that Judge Feikens specifically held on February 3, 1990, in *Ray Indus., Inc. v. Liberty Mutual Ins. Co.*, No. 88–CV–73445–DT (E.D.Mich. Feb. 3, 1990), that "Liberty's duty to defend Ray was triggered on the date Ray received the EPA's PRP letter dated July 1, 1985" (Order of Feb. 3, 1990 at 2). *See also* Memorandum Opinion Dec. 1, 1989, 728 F.Supp. 1310, 1314. I believe that the policyholders read too much into these words of Judge Feikens. He held that Ray became *eligible* to call upon Liberty Mutual's duty to defend upon receipt of the PRP letter. Determination of the exact date of Ray's *entitlement* to defense services and calculation of the exact amount of defense costs due depends on the additional facts of whether and when Ray called upon Liberty Mutual to defend.

While the policyholders are correct that the insurance contract does not specifically require a tender of defense prior to the insurance company's obligation to defend, this duty does appear to be established under Michigan common law. It should also be noted that consistent with this law, the policy specifically cautions "[t]hat the insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of accident." While the policyholders contend that any payments that they made were not voluntary, but were instead made in response to government directives, the fact remains that they did choose to respond to these edicts themselves, instead of formally tendering a demand upon Wausau that it respond to the government and make payments for defense costs and any related hydrogeological studies.

The policyholders argue, in the alternative, that if they are only entitled to defense costs after a tender of defense, then the October 31, 1984 Ex–Cell–O letter to Wausau should be considered a tender of defense. A review of this letter makes it clear that it is a notice of claim letter to comply with the policy requirements.[9] It does not tender or request a defense. The

reasonable; and, further, whether fees and expenses incurred prior to John Hancock filing suit would be covered. Without explanation, the First Circuit noted that "the fact that Continental had breached its duty to defend was already established." *Id.* at 585. It does not explain when this breach was established, in 1973 when Robertson interpreted Continental's response as a firm statement that it would not defend, or in 1975 when the lawsuit was ultimately brought. The court further noted that John Hancock, Robertson, and others involved in constructing the Hancock tower had agreed to delay the filing of any lawsuits in an effort to resolve the problem. Without such an agreement the suit would have been filed sooner, in which case the First Circuit noted "the technical issue now before us probably would not have arisen." *Id.* at 586. The court also made clear that all of the pre-suit legal services would have had to have been performed after the suit was filed, and that there was no question that Robertson had little choice but to retain counsel and prepare to defend itself, as it did when Continental Casualty refused to assist it against the potential contract claim. While the First Circuit did award fees and expenses incurred prior to the commencement of the suit, its opinion seems to be one narrowly limited to the facts. In two places, the First Circuit specifically notes that its holding is decided "[u]nder the circumstances of this particular case," or "under these particular circumstances." *Id.* at 585–86. It is

not clear that the First Circuit, on facts similar to those before this Court, would reach the same conclusion.

9. The October 31, 1984 letter initially referred to Wausau's acknowledgement of a "notice of a claim against Davidson for hazardous waste problems at the Keefe site in Epping, New Hampshire." The second paragraph states that

notice is hereby provided pursuant to various insurance policies covering McCord Corporation and Davidson of potential claims against it for liability arising out of hazardous waste contamination problems at the following sites:
1) Cardinal Landfill, Farmington, New Hampshire;
2) Davidson Rubber Facility, Farmington, New Hampshire; and
3) Tolend Road Landfill, Dover, New Hampshire.
The letter then disputes Wausau's contention that there is no insurance coverage. The letter concludes:
For all these reasons, we believe that Wausau is obligated to provide insurance coverage for the above-discussed claims. I would be glad to communicate with you further on these matters. Please note that you should not construe anything herein as a waiver of our claims against Wausau pursuant to the policies of insurance from January 1, 1970 to January 1, 1979.

formal demand for defense was first made in Ex–Cell–O's January 6, 1986 letter.[10]

Prior to January 6, 1986, I find that the policyholders voluntarily chose to respond themselves to the EPA and New Hampshire environmental regulatory actions. Thus, for all the reasons stated above, I recommend that this Court find that these pre-tender defense costs are waived and are not damages proximately caused by Wausau's later breach of contract.

B. INVESTIGATIVE COSTS—REMEDIAL OR DEFENSE COSTS?

One of the central issues of this dispute, and the one crying out for a conceptually coherent approach, deals with the issue of whether the multiple investigative hydrogeological studies undertaken by the policyholders should be considered defense costs or remediation costs for which Wausau would not be liable in the present litigation. This issue was briefed initially and has been the subject of continued discussion at prehearing conferences. An exchange of correspondence has provided the Court with updates on the most recent cases on this issue.

The parameters of defense costs in traditional tort litigation can be fairly well determined. Yet, unlike the closure a trial provides in tort litigation, CERCLA and other state environmental enforcement activities are undertaken primarily at the administrative level and generally do not result in a traditional, or even in an administrative, adjudication. As a result, the outer parameters of defense costs in actions involving governmental enforcement of environmental laws is unclear. The issues relating to the definition of defense costs are just now evolving in the case law. Analogies to traditional tort adjudication can provide only limited guidance in defining defense costs in environmental controversies. Unfortunately, these analogies do not provide a principled approach to separate defense from remediation costs in environmental cases. Now that the duty to defend and the duty to indemnify are clearly recognized as separate obligations under many insurance policies, pollution exclusion clauses and other provisions will create a number of situations where there is a duty to defend without a duty to indemnify. Thus, the need to distinguish between defense costs and indemnification will arise more frequently in environmental protection actions than in traditional tort litigation.

I have struggled without success to define a conceptually coherent approach that can be applied in a judicially manageable manner to make this distinction. In the present case, there has not yet been any adjudicative determination regarding liability. The policyholders continue to interact, cooperate, and negotiate with the various governmental units over the environmental dispute. It is not clear that these cases will ever be adjudicated.

1. WAUSAU'S POSITION

Wausau notes that the New Hampshire Department of Health and Welfare issued a Regulatory Order on December 9, 1981, ordering Davidson Rubber Company to install monitoring wells and undertake hydrogeological studies at the Cardinal Landfill to analyze possible ground water contamination. One of Davidson's attorneys, Sherilyn Burnett Young, noted that following the first study by Westin Engineering, a second and third phase was undertaken by Geotechnical Engineers, Charles T. Main, and ChemCycle. Ms. Young contends that the second and third phases of the hydrogeological investigation were a continuation of the first phase, and all work was performed to comply with the Regulatory Order.

Wausau contends that because this and other studies were undertaken to comply with instead of oppose regulatory orders, these costs are remedial and not costs to defend, defeat, or limit the government's claims. Wausau argues that Davidson Rubber neither contested nor opposed the requirements imposed by New Hampshire

---

**10.** This January 6, 1986 letter and Davidson Rubber's internal legal memorandum concerning the pros and cons of tendering the claim for defense makes it clear the policyholders knew the difference between *notice* of a claim and *tendering* the defense of a claim.

in the Regulatory Order. Wausau notes that Ms. Young acknowledged that had Davidson Rubber refused to comply, the government either would have done the studies itself and sued Davidson Rubber for the costs, or it would have sought injunctive relief in state court and requested an order that Davidson Rubber comply.

Wausau contends that Davidson Rubber initiated an investigation at its Farmington Plant site in compliance with the same December 9, 1981 Regulatory Order because that order also required a determination of whether the outflow of the paint line operations into a disposal lagoon resulted in hazardous waste. This investigation necessitated extraction procedures and analysis to determine "toxicity contaminants and organic solvents." The tests were required on the waste water entry into the lagoon at the Farmington Plant site, on the sludge accumulation in the holding tanks, and on core samples of soil in the lagoon. The New Hampshire Water Supply and Pollution Control Commission issued a Notice of Violation and Order of Abatement on October 13, 1983, which required that additional hydrogeological investigation be done at the plant site. While Ms. Young noted that Davidson Rubber challenged the authority of the Commission to require such studies, because the lagoon was closed and it was not an on-going operation, Davidson Rubber nonetheless hired Geotechnical Engineers Charles Main and ChemCycle to complete the remedial investigation at the site.

The EPA notified Davidson Rubber in June 1984 that it was a potentially responsible party ("PRP") in connection with its use of the Dover Landfill (Young Dep., Jan. 3, 1990, at 118–19). In February 1988, an Administrative Order By Consent was entered into by Davidson Rubber and twelve other PRPs with both the State of New Hampshire and the federal EPA, in which it was agreed that the PRPs would fund the completion of a feasibility study at the Dover Landfill and pay federal and state past costs and expenses for investigations already performed. In March 1988, the thirteen PRPs deposited funds into a "Dover Landfill Trust Fund" that would be used to make payments in accordance with the agreement with the government. Davidson Rubber contributed $696,000 to that fund. Thereafter, certain portions of the trust fund were paid to the state for past costs. Wausau notes that under the CERCLA regulations, 40 CFR § 300 *et seq.*, a remedial action is defined as including both "remedial investigation" and "feasibility study." 40 CFR § 300.68. Accordingly, Wausau argues that all investigations to determine the necessity for and the extent of remedial action are remedial costs and not defense costs, particularly when the insured does not contest liability against the underlying state or federal claims.

## 2. THE POLICYHOLDERS' RESPONSE

The policyholders contend that environmental "suits" that were found to be covered by Judge Feikens are, under Michigan law, to be defended with all resources available to a party, just as in a traditional lawsuit. At the time of the filing of the claim for defense costs, there were but two Michigan Circuit Court cases dealing with the concept of defense costs. Since then, there has been a Court of Appeals case as well as another Eastern District of Michigan case applying Michigan law. The policyholders have also cited opinions in other jurisdictions that attempt to distinguish between defense costs and remediation costs.

The policyholders have supplied the Court with the transcript of a hearing held before the Honorable Chester J. Byrns, Circuit Judge for Berrien County on December 21, 1984, in *United States Aviex Co. v. Travelers Ins. Co.*, No. 80–107–NZ–R (Mich.Cir.Ct. for Berrien County). In *Aviex*, certain studies had been ordered by the Department of Natural Resources ("DNR"), and Travelers claimed in opposition to Aviex's motion for partial summary judgment that these studies were undertaken to remedy water contamination at the site of the old Aviex plant and were not for investigation and defense. The Berrien County Circuit Court had previously determined that Travelers was to provide insurance and coverage for these investigative studies, and was affirmed by the Michigan Court of Appeals. *United States Aviex*

*Co. v. Travelers Ins. Co.*, 125 Mich.App. 579, 336 N.W.2d 838 (1983).

The underlying claim was the result of a fire at Aviex's chemical warehouse on November 25, 1978, that resulted in chemicals being soaked into the ground during the fire fight and reaching the aquifer. DNR demanded that Aviex undertake investigations. Aviex made a demand upon Travelers to defend it, which was refused. The Berrien County Circuit Court determined that the matter was covered by the policy, and that Aviex had a duty to defend, which included an investigation as to whether there was pollution, and if so its nature, its location, and its extent. Proceedings of Dec. 21, 1984, Tr. at 5. The DNR brought a separate suit against Aviex to obtain investigative studies to determine the nature, flow, and location of the chemical contamination, as well as the corrective measures needed. Travelers argued that because the DNR had demanded in its suit that Aviex take certain action, these costs were not defense costs.

Judge Byrns found that it defied logic to conclude that

> the costs incurred in investigating or defending or considering the alternative approaches in a search for the most efficient and economical corrective measures makes such work and expenses remedial as to be excluded from the duty of the insurance carrier to investigate and defend the claim....

*Id.* at p. 6. He quoted from *Cooley v. Mid-Century Ins. Co.*, 52 Mich.App. 612, 616, 218 N.W.2d 103 (1974), in which the Michigan Court of Appeals stated:

> We are of the opinion that the duty to defend necessarily includes any investigation necessary and proper in preparing a defense, for absent such investigation the defense of any subsequent suit filed will be seriously impaired ... If a trial court determines that an insurer was obligated to defend its insured, then the insurer is liable for any investigative costs. Where an insurer breaches its duty to defend, it is not permitted to reap

the fruits of an investigation performed by its insured without compensating the insured for the costs of his investigative efforts.

Tr. at 6–7. Judge Byrns noted that it was in

> the best interest of both Travelers and Aviex that the most efficient and low cost corrective means be employed once the problem could be clearly localized and identified. And therefore, the investigation has this as a major goal.[11]

*Id.* at 7.

The policyholders also cite the unpublished opinion of Judge William G. Schma in *ARCO Indus. Corp. v. Home Indem. Co.*, No. 87–0218–CK (Mich.Cir.Ct. for Kalamazoo County) (Order Regarding Payment of Defense Costs, July 11, 1989). Judge Schma found that general investigative consultation was payable as a defense costs because

> [y]ou can't conduct a lawsuit that's this complicated and difficult and sophisticated without having consultants....

Proceedings of June 9, 1989, Tr. at 6 (printed in Mealey's Litigation Ins.Rep. (Aug. 8, 1989)).

Subsequent to *Cooley*, *Aviex*, and *ARCO*, the Michigan Court of Appeals in *Gelman Sciences, Inc. v. Fireman's Fund Ins. Cos.*, 183 Mich.App. 445, 455 N.W.2d 328 (1990), determined that the cost of Gelman Sciences' efforts to provide water hookup to neighbors who were affected by contamination from its plant, as well as sewer installations, did not constitute a defense cost. Gelman had argued that these efforts were undertaken to mitigate damages and thus should be considered defense costs because they would reduce liability. The Michigan Court of Appeals ruled:

> Gelman ignores the fact that were it ultimately found not liable for the ground water contamination, it would not be legally responsible for the expenditures in question. The hookup and sewer installations are not necessary to defend Gelman. Rather, they represent an

---

**11.** Unlike the present case, it is clear from an appellate opinion in the *Aviex* case that the trial court found both a duty to defend and to indemnify. 125 Mich.App. at 584–5, 336 N.W.2d 838.

attempt to prevent injury that may occur in the future due to present ground water contamination. They are an effort to make potential injured parties whole. Preventative measures are cost effective and commendable, but in this case, they are indemnification damages not defense costs.

*Id.* In *Gelman*, the Washtenaw County Circuit Court had not yet determined whether the insurer had a duty to indemnify, but it had already determined that there was a duty to defend.

In *Higgins Indus., Inc. v. Fireman's Fund Ins. Co.*, discussed above, this Court applied *Gelman Sciences* and made specific findings that costs up until July 1, 1987, were defense costs, and that costs after that date were remediation costs. In his Report and Recommendation, Magistrate Judge Goldman found that the environmental work done prior to July 1, 1987, was primarily focused on determining whether the contaminants had come from Higgins Industries or from an adjacent industrial site owned by another company. These studies were efforts to determine the nature of the problem, to discover where the contaminants were, and where they had come from. The Court further found that the majority of the work performed since July 1, 1987, was done to determine the appropriate means by which to correct the problem and to prevent further migration of the contaminants. Interpreting *Gelman* as excluding from defense costs those efforts undertaken to correct the problem or to mitigate the problem, the Court found that only the costs prior to July 1, 1987, could be reimbursed as defense costs.

In the present case, the policyholders, through their environmental attorneys as well as highly qualified expert witness attorney Edward I. Selig, have indicated that the hydrogeological studies undertaken in response to various governmental demands were precisely the kinds of studies that an environmental defense lawyer would need to defeat or limit liability. At the hearing on this question, I raised the issue as to whether or not each of the hydrogeological studies should be analyzed with a view to how it might hypothetically be utilized either to defeat liability or to limit the scope of remediation at some future "trial-type" adjudication. The policyholders indicated that to do this, the record would need to be supplemented so that its environmental lawyers and its experts could address each hydrogeological study and to put into focus for the Court how each could be utilized in defense of the policyholders. They proffered that their environmental lawyers and experts could provide the Court information as to how each study might be used in any future defensive action on behalf of the policyholders.

Determining defense costs as they relate to an actual, concrete adjudication is, albeit complicated, nonetheless a manageable task. Determining which of the studies that had been ordered by the government could hypothetically be used in the defense of the policyholders in some future adjudication or negotiation would be an adjudicative nightmare and an unwelcome adjudicative burden on this Court that would risk departing altogether from the reservation of reason and entering into the land of hypotheticals and speculation.[12]

Without an actual adjudication with defined issues which could focus and limit the contours of the question, I doubt any reliable answer could be given to the relevant legal factual question of what and how many hydrogeological studies were "reasonable and necessary." While limiting the scope of defense costs to a determination of the nature, source, and extent of the contaminants, as this Court did in *Higgins Industries*, makes the task less demanding,

---

**12.** With the fiftieth anniversary of the December 7, 1941, surprise attack on Pearl Harbor, many naval historians are speculating about the course of the Pacific war had America avoided this attack. Most historians anticipate that instead of the distant battles fought by our surviving aircraft carriers, a close engagement of battleships on a monumental scale would have been likely sometime in 1942. One commentator noted that "[t]here is nothing more speculative than predicting the outcome of a sea battle that never occurred." Neal Conan, Pearl Harbor Remembered, National Public Radio, December 6, 1991. Much the same could be said of predicting defense costs for an environmental adjudication that no one expects to occur.

I believe that the *Higgins Industries* approach is incomplete because, even if responsibility is conceded, certain defense costs are "necessary and proper" in order to limit remediation costs by seeking "the most efficient and economical corrective measures." *See Aviex*, Tr. at 6–7.[13]

With no suggestion in the present case that the policyholders are planning their major defense on the issue of responsibility, the bulk of defense costs relate to determining the remedial measures necessary. But again, like any adjudication, these ultimate corrective measures lie in the future. Thus, at present, the contextual facts needed for a meaningful determination of "necessary and proper" defense costs do not have the "fixed and final shape" which the Supreme Court finds necessary for federal courts to decide issues before them in declaratory judgment actions. *See Public Serv. Comm'n v. Wycoff Co.*, 344 U.S. 237, 244, 73 S.Ct. 236, 240–41, 97 L.Ed. 291 (1952).

While the policyholders seek declaratory judgment regarding a final calculation of their defense costs, the Supreme Court has long held that the Declaratory Judgment Act "is an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant." *Id.* at 241, 73 S.Ct. at 239. The Sixth Circuit applies two general principles to guide the exercise of this discretion: (1) whether the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) whether the judgment will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding. To determine whether these results can be achieved, five factors are to be considered: (1) whether the judgment would settle the controversy; (2) whether the judgment would serve a useful purpose in clarifying the legal relations at issue; (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata"; (4) whether the declaratory action would increase friction between our federal and state courts and improperly encroach on state jurisdiction; and (5) whether there is an alternative remedy that is better or more effective. *Omaha Property & Casualty Ins. Co. v. Johnson*, 923 F.2d 446, 448 (6th Cir.1991); *Allstate Ins. Co. v. Mercier*, 913 F.2d 273, 277 (6th Cir.1990); *Grand Trunk W. R.R. Co. v. Consolidated Rail Corp.*, 746 F.2d 323 (6th Cir.1984).

While these factors were devised to help a district court determine whether or not to retain jurisdiction over a declaratory judgment action, similar considerations should apply after the court has taken jurisdiction to determine the limits of where it can provide its declaratory judgment in a coherent and credible way. When asked to decide a question that is dependent on and

---

**13.** Obviously, the duty to defend a company includes not only a duty to defend on the ultimate liability, but also to defend, even if liability is found, by assisting that party to limit the amount of damages by way of any remedial action that is necessary. While *Gelman Sciences* is cited as a helpful tool, it is useful only for distinguishing between defense costs and mitigation costs. Its test, if the respondent were "ultimately found not liable for the ... contamination, it would not be legally responsible for the expenditures in question," if applied literally, would exclude from defense costs the cost of efforts to determine the extent and to limit the amount of damages and remedial action necessary. *Higgins* suggests that only costs to determine what substances were in the soil and ground water, how far they had travelled, and "most significantly, where it originated" as the limit of defense costs because these were "designed to assist [the respondent] in determining whether or not it was liable for the cleanup as claimed by the [Michigan Department of Natural Resources]." Magistrate's Report and Recommendation, at 11. These costs are aimed at the issue of liability. *Higgins* suggests that costs incurred to determine "the scope of the contamination so as to develop a complete, cost-effective remediation plan and to prevent the contaminants from spreading into the adjacent wetlands" are remedial and "are more appropriately deemed indemnifications costs." *Id.* at 11–12.

This analysis seems incomplete. An appropriate defense, even for a liable party, requires those investigations necessary to limit the damages imposed upon the party being defended, and these also may require "necessary and proper" studies. The problem in the present situation is how this Court is to determine what studies were "reasonable and necessary" either to defend against liability, or to accomplish the most effective and cost efficient remedy to limit the liability to the respondents.

intertwined with events that lie in the future, deferring the decision until the relevant facts have emerged will allow for "an alternative remedy that is better [and] more effective."

In *Manley, Bennett, McDonald & Co. v. St. Paul Fire & Marine Ins. Co.*, 791 F.2d 460 (6th Cir.1986), a stock brokerage firm brought a declaratory judgment action against the issuer of its stockbrokers' fidelity bond, seeking a declaration that the insurer was obligated to provide coverage and indemnify the firm for the cost of defending a suit against it. The Sixth Circuit held that a superior remedy existed in the form of an action for indemnity after the conclusion of the underlying action. It stated:

> At that point, the court will have the benefit of the record in the liability trial, and (the outcome of that trial being known) the issue of coverage as to costs of defense will be shaped by the actual facts of the case as found.

*Id.* at 463.

■ Thus, I believe this Court should exercise its discretion to limit the scope of the declaratory judgment being provided. This Court should not try to determine what hydrogeological studies were "necessary and proper" without an adequate factual basis and a completed context for making this difficult determination. Nor do I believe this Court should retain jurisdiction over this remnant of the controversy. Rather, this Court should exercise its discretion to render a final declaratory judgment on those issues within its competence.

It is only the environmental consultant's fees upon which Wausau is making a categorical attack. It is not contesting that the several hundred thousand dollars in attorney fees are legitimate defense costs. Its attack on the attorney fees is limited to pre-tender fees and certain targeted objections that I shall resolve in the supplemental report and recommendation calculating the actual amount of the attorney fees and other defense costs.

■ Because I do not accept Wausau's categorical position that *all* consultants' fees are remedial because they were undertaken in response to government demands, I recommend that this Court declare that defense costs include more than costs and hydrogeological studies needed to defeat or limit liability, but also those hydrogeological studies that are reasonable and necessary to limit the scope and the costs of remediation. While there may be a prima facie case established that hydrogeological studies are remedial when undertaken in response to government demands for a remedial investigation and feasibility study, this can be rebutted by the policyholders showing that such studies are "necessary and proper" to limit the scope or cost of remediation. Yet, this final question, of exactly which consultants' fees are "necessary and proper" to limit the remedial costs, should not be determined at this time, when the ultimate remedy and the issues and the outcome of an administrative adjudication are, at most, speculative. Also, because of the discretion available to this Court and the limits placed on declaratory judgment jurisdiction, I recommend that this Court not retain jurisdiction to resolve this final question, because its meaningful resolution depends on future facts and happenings.

RECOMMENDATION

For the reasons stated above, it is recommended that this Court enter declaratory judgment that:

1. Defense costs proximately caused by Wausau's breach of its contractual duty to were voluntarily made;

3. The policyholders' tender of defense was first made on January 6, 1986;

4. That defense costs include not only those reasonable and necessary costs to defeat or limit liability, but also those costs, including consulting fees, that are reasonable and necessary to limiting the scope and/or costs of remediation, even if similar or identical studies have been ordered by the government.

I further recommend that this Court exercise its discretion not to undertake at this time the speculative and time consuming task of determining which consulting fees

are reasonable and proper defense costs, and that this Court not retain jurisdiction on this matter until the facts and circumstances develop that are necessary for a meaningful determination of this issue.

Notice is hereby given that this Special Master's Report and Recommendation is being filed with the clerk of the court pursuant to Fed.R.Civ.P. 53(e)(1). Under Rule 53(e)(2), parties shall file written objections within ten (10) days after being served with this notice and report, or such objections may be waived. Application to the Court for action on this report and upon objections shall be by motion. Within ten (10) days of filing, the Special Master shall convene a status conference with counsel for the parties to expedite the completion and filing of a final report and recommendation calculating the actual defense costs consistent with the findings and recommendation of this Special Master's Report and Recommendation.

Dated: December 27, 1991.